# APRIL TERM, 1890.*

THE ALPENA NATIONAL BANK v. HARRIS GREENBAUM
AND NATHAN EPSTEYN, IMPLEADED, ETC.†

[See 74 Mich. 157]

*Principal and surety—Bills and notes—Pleading—Fraud—False
representations—Trustees—Banks and banking—Evidence.‡*

1. A lumbering corporation mortgaged all of its property to secure
certain creditors, among whom was a bank of which the mort-
gagee was president, which had discounted the mortgagor's
notes. Among such notes were two given in renewal of paper
made in payment for goods, and which the payees had indorsed
in such a manner as to become sureties for the maker, and
upon which they had received full payment. The mortgagee
disposed of the property, and paid all of the claims in full
except said discounted paper, and held the balance for *pro
rata* distribution. Before such partial payment was indorsed,
the bank sued the corporation and indorsers upon the two
notes, in which suit the indorsers gave notice that they would
show that the credit for the goods sold the corporation was
secured through the representations of the president of the
bank as to the solvency of the corporation, and that if they
would sell the goods the bank would discount the corporation's
notes given therefor, and that the vendors should not be liable
on their indorsements of such notes; that at this time the cor-
poration was indebted to the bank, and it was agreed between

---

*Continued from Vol. 79.

† A satisfactory report of this case has been a task which I can
hardly hope to have accomplished, but the leading facts and points
have been summarized, which I trust will aid in its examination.
—REPORTER.

‡For full digest of points decided, see *Table of Cases Reported.*

it and the president of the · bank that such representations should be made, when in fact the corporation was insolvent, to the knowledge of said president. The suit was tried, and the bank recovered a judgment for the full amount of the notes, which the Supreme Court reversed, on the ground that the evidence showed that the mortgagee had collected sufficient money to pay *all* of the secured claims, of which sum enough was held by him in deposit in the bank to pay the notes in suit, and that it was the duty of the bank to make such application. See *Bank v. Greenbaum*, 74 Mich. 157.

On a second trial the defendants added to their former notice a copy of the opinion of the Supreme Court, and also gave· notice that they would show that at the time of their indorsement of the *notes in suit* there was a fraudulent agreement between the bank and the corporation that the latter would turn over all of its property to the bank when asked so to do, or give security thereon, for its indebtedness to the bank, which agreement was concealed from the defendants, as· also the fact of such indebtedness, a knowledge of either of which facts would have prevented them from taking or indorsing the notes in suit. The president of the bank (mortgagee) testified on such trial positively that the property did not realize enough to pay all of the secured debts, and that after paying all of said debts which had *priority* over said discounted paper he deposited the balance in the bank, and took certificates of deposit in his own name, but deferred applying the *pro rata* share applicable to the notes in suit until the validity of defendants' indorsements was determined. The defendants recovered a general verdict, and on a second review of the case it is held that, if the mortgagee's testimony was true, he was justified in not making such *pro rata* distribution. And it is further held that if the defendants are not entitled to be discharged absolutely from all liability by reason of the fraud and deceit set up in their notices, which right it is held they have not maintained by *legal* and *proper* testimony, the proper method for them to pursue, if they believe the trustee has not faithfully executed his trust, is to file a bill in chancery for an accounting, in which suit the whole matter of such execution can be gone into, and the trustee charged with all proper items. The bank can be made a co-defendant, and, upon a proper showing, the further prosecution of this suit can be enjoined until such accounting is completed.

2. The following propositions are summarized from the opinion of Chief Justice CHAMPLIN:

    *a*—There is no practice authorizing a defendant to interpose

a special notice of defense, setting forth the opinion of the Supreme Court on reversing a judgment recovered by the plaintiff on a former trial.

b—Where, in a suit upon two promissory notes against indorsers, a judgment in favor of the plaintiff is reversed on the ground that the record shows that the notes have been paid, a judgment in favor of the defendants on a second trial will stand affirmed, unless the record discloses a different state of facts upon the question of such payment.

c—It is not sufficient to show the making of representations alleged to be false, but their falsity must be proved in order to charge the maker with actionable fraud.

d—The practice is settled in this State, as at common law, that it is not competent to prove distinct facts in defense that have not been made part of the issue as framed. *Bourreseau v. Evening Journal Co.*, 63 Mich. 437.

So *held*, where evidence of a different fraud than that set up in defendant's notice was admitted by the trial court.

e—The payees in certain notes sold them to a bank, and became sureties for the maker by the manner of their indorsement. At the request of the maker, and by the consent of the sureties, the notes were renewed, on which renewal notes suit was brought, and the sureties (indorsers) claimed that they were induced to consent to the extension by the fraudulent representations of the holder of the notes as to the solvency of the maker, and that their *second* indorsement was void; and it is held that, if the renewal notes were invalid, the original notes remained in full force, upon which the indorsers were liable, and that their defense, if sustained, only went to a recoupment, under proper pleadings, to the extent of the injury actually suffered by reason of extending the time for payment.

f—Where, in a suit against indorsers their defense is non-liability because of fraud practiced in securing their indorsement, testimony which recognizes such liability, and seeks to establish a discharge by matters *ex post facto*, is inadmissible.

g—Good faith and fair dealing is all that is required of a creditor in his transactions with a debtor who occupies the position of a surety to a contract, and these do not require the creditor to inform such surety of *other* and independent transactions with the principal debtor.

h—To hold that, when an indorser of a note applies to have it discounted for his own accommodation, the silence of the bank as to other indebtedness of the maker to the bank, and of his assurance that he will give security if required, is a fraud upon the indorser, enabling him to retain the considera-

tion received for the note, and discharge him from liability as indorser, is a doctrine too palpably absurd for serious consideration.

*i*—To hold a bank as trustee, *simply* because its president and financial manager is a trustee for the benefit of creditors, would operate harshly and unjustly upon the rights of a majority of its stockholders, and make them responsible for acts which neither they nor the board of directors of the bank ever authorized or assented to, and would unjustly condemn them to losses concerning which they have never had a hearing in a court of justice.

Error to Ingham.    (Peck, J.)    Argued January 15, 1890.
Decided April 11, 1890.

*Assumpsit.*    Plaintiff brings error.    Reversed.    The facts are stated in the opinion.

*Cahill & Ostrander (R. J. Kelley,* of counsel), for appellant, contended:

1. Neither the president nor cashier of a bank has the right, without express authority from the board of directors, to release an indorser or surety on a note without payment; citing *Bank v. Dunn,* 6 Pet. 51; *Bank v. Jones,* 8 Id. 12; *Horrigan v. Bank,* 9 Baxter, 142; *Mapes v. Bank,* 80 Penn. St. 163; *Bank v. Bennett,* 33 Mich. 520; *Wheat v. Bank,* 5 S. W. Rep. 305; *Thompson v. McKee,* 5 Dak. 172; Morse, Bank. (2d ed.) 146–149, 188.

2. The fact that, as between themselves and the Prentiss Lumber Company, the latter should have paid the notes, did not prevent the bank's regarding the indorsers as principals; citing *Wetherwax v. Paine,* 2 Mich. 555; *Rothschild v. Grix,* 31 Id. 150; *Herbage v. McEntee,* 40 Id. 337; *Sibley v. Bank,* 41 Id. 196; *Robbins v. Brooks,* 42 Id. 62.

*Turnbull & Dafoe (R. A. Montgomery,* of counsel), for defendants.

*J. C. Shields,* of counsel for defendants, contended:

1. In support of the claim that the former decision is conclusive upon the present record, counsel cited Wells, *Res. Adj.* §§ 145, 146; *Railroad Co. v. Ketchum,* 34 How. Pr. 302; *Stacy v. Railroad Co.,* 32 Vt. 551; *Stewart v. Sprague,* 76 Mich. 184; *Barnum v. Stone,* 27 Id. 332; *Bewick v. Fletcher,* 41 Id. 625; *Mynning v. Railroad Co.,* 67 Id. 677.

2. To receive a surety known to be acting upon the belief that there are no unusual circumstances by which his risk will be materially increased, with full knowledge of their existence, which is withheld, releases the surety; citing De Coly. Guar. 376; *Dawson v. Lawes*, 23 Law J. Ch. 434; *Mactaggart v. Watson*, 3 Clark & F. 525; *Shepherd v. Beecher*, 2 P. Wms. 288.

3. The creditor is bound to observe the utmost good faith towards the surety in all subsequent transactions with the principal debtor; citing Story, Eq. Jur. § 324; *Leicester v. Rose*, 4 East, 372.

4. All the authorities hold that, when the original contract is changed in the least, it discharges the surety; citing 2 Pom. Eq. Jur. § 907, and cases cited; Cooley, Torts, 483; *Machine Co. v. Farrington*, 82 N. Y. 125; *State v. Sooy*, 39 N. J. Law, 142; *Sewing Machine Co. v. Kezertee*, 49 Wis. 414; *Booth v. Storrs*, 75 Ill. 438; *Han v. Greve*, 34 Ind. 18; *Doughty v. Savage*, 28 Conn. 146; *Graves v. Bank*, 10 Bush, 30; *Bank v. Railway Co.*, 65 Iowa, 692.

CHAMPLIN, C. J. This case was before this Court at the January term, 1889, and is reported in 74 Mich. 157.

The Prentiss Lumber Company was a corporation organized under the laws of the State of Michigan, and was doing business at the city of Alpena, where it owned a saw-mill, and was engaged in the manufacture and sale of lumber. On September 7, 1883, it was largely in debt; and on account of losses and financial embarrassments, it was not able to meet its commercial paper at maturity, and, in order to secure the payment of certain classes of its paper and debts, it executed to George L. Maltz, of Alpena, two mortgages,—one upon its saw-mill property and appurtenances, upon condition and in trust to pay the following indebtedness, with interest at 7 per cent. until paid, namely:

| | |
|---|---:|
| George L. Maltz | $13,000 00 |
| The Alpena National Bank | 77,500 00 |
| Hubbell, Brown & Co., of Cleveland, Ohio | 2,000 00 |
| Pierce & Coleman, of Dayton, Ohio | 7,500 00 |
| Mary C. Prentiss, of Alpena | 2,700 00 |
| Rectina P. Chase, of Syracuse, N. Y. | 186 00 |

A. R. &. W. F. Linn, of Detroit................ $3,035 75
The Labor account............................ 10,000 00

Total .................................... $115,921 75

The other mortgage was upon certain personal property, and was also in trust to pay the following indebtedness of the Prentiss Lumber Company, with interest at 7 per cent. until paid, namely:

George L. Maltz, of Alpena .................. $13,000 00
The Labor Account, being the aggregate amount then due certain laborers and employés then in the employ of the company, for labor performed about the mill and mill premises, and the rafting and handling of logs of the company................................... 10,000 00
The Alpena National Bank, a sum sufficient to cover the direct loans of the bank made to the Prentiss Lumber Company, and the amount of all paper held by the bank accepted or indorsed by A. R. & W. F. Linn or George Prentiss, and estimated at about............ 21,535 75
Perry Prentiss, of Cleveland, Ohio............ 1,500 00
Hubbell, Brown & Co., of Cleveland, Ohio.... 2,000 00
Pierce & Coleman, of Dayton, Ohio.......... 7,500 00
Mary C. Prentiss, of Alpena................. 2,700 00
Rectina P. Chase, of Syracuse, N. Y.......... 186 00
The remainder of the indebtedness to the Alpena National Bank, arising from paper of first party held by said bank, about the sum of... 59,000 00

Total.................................... $117,421 75

It was expressly agreed in the chattel mortgage that the indebtedness stated above should be paid in the order above set forth, so far as the avails of the chattel mortgage security would pay the same. The mortgagee was authorized to sell at public or private sale, and apply the proceeds thereof in liquidation of said debts, interest, and reasonable expenses.

Both mortgages bore date September 7, 1883, and were executed at the same time, as parts of one transaction, and, according to familiar rules, must be construed

together, as one instrument. Maltz immediately took possession of the personal property, and proceeded to convert it into money. A quantity of logs he hired sawed at the mill, and sold the lumber. He has converted all of the property covered by both mortgages into money, and has received as the avails thereof the following sums:

| | |
|---|---:|
| From the sale of logs | $36,638 55 |
| From the sale of lumber | 37,998 02 |
| From the sale of other personal property | 2,683 76 |
| From the sale of saw-mill | 35,000 00 |
| Total | $112,320 33 |

It appears that previous to the failure of the Prentiss Lumber Company the defendants, Greenbaum and Epsteyn, being then in partnership, and prior to January 1, 1883, sold to the Prentiss Lumber Company goods for which they took the notes of the company. Such notes were by them indorsed and discounted at the Exchange Bank of George L. Maltz. After February 1, 1883, one of such notes was sold and transferred by Maltz to the Alpena National Bank, and another, given April 23, 1883, was by Greenbaum and Epsteyn indorsed and discounted at the Alpena National Bank; and were held by the bank at the time the mortgages were executed to Maltz, and formed a portion of the class secured by the last clause of the chattel mortgage. The Alpena National Bank brought this suit against the maker and indorsers of these notes, two in number, which had been given in renewal of such former notes. The indorsers appeared to the action, and set up several defenses in their notice filed under the plea of the general issue, viz.:

1. That Greenbaum and Epsteyn sold goods for which the notes were given to the Prentiss Lumber Company upon credit, by and through the representations of Maltz as to the solvency and standing of the Prentiss Lumber Company, and to the effect that, if they would sell to the Prentiss Lumber Company on credit, and receive its

notes, the Alpena National Bank would receive such notes, and discount the same, and look absolutely to said Prentiss Lumber Company for their payment, and that Greenbaum and Epsteyn were not to be liable upon their indorsements at all.

2. That Greenbaum & Epsteyn were induced to sell goods to the Prentiss Lumber Company by the false and fraudulent representations of Maltz, as president and general manager of the Alpena National Bank, that the Prentiss Lumber Company was entirely solvent, and had goods, money, and other property, to the amount of over $100,000, over and above all debts and liabilities, and the defendants would be safe and secure in making such sales upon credit; that at this time the Prentiss Lumber Company was indebted to the Alpena National Bank in the sum of several thousand dollars, and there· was an understanding and agreement between George Prentiss, representing the Prentiss Lumber Company, and George L. Maltz, as president and general manager of the Alpena National Bank, that the said Maltz, as president and general manager, should represent the Prentiss Lumber Company to be entirely solvent, and in good credit, when, as a matter of fact, it was absolutely insolvent, and known to be so by the said George L. Maltz, for the purpose of getting credit, and inducing Greenbaum & Epsteyn to sell on credit said goods, and take therefor the notes of the Prentiss Lumber Company.

After the reversal of the case in this Court, as before stated, the defendants interposed another notice, which is entirely unauthorized in practice, setting forth in such notice the entire opinion of this Court in disposing of the case, and also the memorandum filed in refusing a rehearing.

They also appended thereto a notice of a third defense, as follows:

"And· also that at the time the notes in suit were indorsed there was a fraudulent understanding and agreement between the Prentiss Lumber Company, represented by George Prentiss, and the plaintiff that, whenever the plaintiff should ask for it, or demand the same, the Prentiss Lumber Company would turn over to the plaintiff, absolutely, all its property, or give security thereon, to

pay or secure a large indebtedness due from the Prentiss Lumber Lumber Company to the plaintiff, which agreement and understanding was fraudulently concealed from all of said defendants by the plaintiff, as well as the existence of any indebtedness from the Prentiss Lumber Company to the plaintiff, when, if either of said facts were made known to any of said defendants, said defendants would not have taken or indorsed the notes of the Prentiss Lumber Company in suit."

When the case was here before, it satisfactorily appeared to us, from the record then before us, that Mr. Maltz had collected from the assets sufficient money to pay all of the claims secured by the mortgages in full; and it was upon this fact that we held the notes in suit paid. We said:

"It appears that Mr. Maltz collected and holds in deposit, in the bank or in his hands, money enough to pay this paper, and which is, by the terms of the trust, applicable to such payment."

And we refused to examine the other errors alleged—

"Because, in our opinion, the evidence showed payment of the paper."

The first question to be disposed of, therefore, is whether the record now before us discloses a different state of facts upon that point. If it does not, the judgment in favor of the defendants must stand affirmed, as the opinion then announced, so far as the facts are the same, is the law of the case.

The testimony presented in this record is not the same upon *this point* as it was when the case was tried before. The defendants' counsel did not see fit to rest their defense before the jury upon the question of payment, nor, indeed, were they content to try the case upon the same issues involved in the suit as first tried, but they interposed a notice of a new and different defense, and introduced a mass of testimony which they claimed tended

to prove the defenses set up in their notice; and these defenses were submitted by the court to the jury as if they were of the first importance, and the question of payment was laid before the jury in a manner which made it appear to be of only secondary importance. The jury found a general verdict for the defendants. So we are unable to determine whether the jury found that the notes had been fully paid because of enough money having been collected to pay the indebtedness secured by the mortgage in full, or whether they found that there was no cause of action on account of the other defenses set up.

On the trial in this case, Mr. Maltz testified positively and unequivocally, that—

"The property did not realize enough to pay all the indebtedness covered by the mortgage."

He also testified that after converting all the property into money, and paying all the indebtedness mentioned in the mortgage prior to that secured by the last clause, the balance on hand to apply upon this indebtedness was the sum of $13,842.65; that the last money realized was the sale of the saw-mill on February 15, 1886; and that, since the last trial, he had apportioned the balance on hand *pro rata* among the creditors in that class as of that date, and had indorsed the share applicable to the notes in suit upon such notes. If this testimony be true and there is no positive testimony in contradiction of it, then the notes in suit were not fully paid, as held in our former opinion. Whether the jury found it true or not, we cannot tell, because the other defenses were submitted to them, and the judge instructed them if they found such defenses established by a preponderance of testimony, they should find for the defendants.

I shall not analyze the testimony *pro* and *con* to show, or draw inferences, that enough money had in fact been

received to pay in full all claims secured by these mortgages out of the $112,320.33 acknowledged to have been received by Mr. Maltz.    I will only say that possibly the figures and the testimony may be so handled as to make it appear that enough was received; and the skillful counsel for the defendants in his brief so places them as to make it thus appear.    But he has made no allowances for interest, or expenses of the trust.    The indebtedness all drew interest, some of which had accrued at the time the mortgages were executed.    The property was sold from time to time during the years 1883, 1884, 1885, and 1886; the last sale being the saw-mill, for $35,000, on February 15, 1886.    The mortgages were dated September 7, 1883.    From this date to the last sale was two years, five months, and eight days.    It would be within bounds to say that at least an average of one year's interest accrued upon the total indebtedness.    We gather from the testimony that the face indebtedness, without interest, embraced in the last clause of the mortgage, was at its date $50,846.84, to which add one year's interest at 7 per cent.,—$3,559.28,—makes a total of $54,406.12.    The prior indebtedness secured by the mortgage, as we gather from the testimony, was $58,441.75; to which add one year's interest,—$4,090.92; total, $62,532.67,—making the total indebtedness to be paid, including one year's interest, $116,938.79, which exceeds the sum realized for the property, to say nothing of the expenses of executing the trust, which must have been considerable.    Whatever deficit there may be must fall upon the last class secured by the mortgages.

I do not pretend to accuracy in the above figures. This can only be arrived at by an accounting, if there is any dispute, between Mr. Maltz and the creditors.    If, however, as appears to be the case with these defendants, such creditors deny all liability on their contract of

indorsement by reason of the defenses set up in this case, a suit at law will be necessary to settle that question; and this brings us to a consideration of this branch of the case as presented by this record.

In order to understand the points raised by the assign- ments of error, it is necessary to bear in mind the dates of certain events which have an important bearing upon the rulings of the court in the admission of testimony, as well as upon the defenses set up under the notices given under the plea of general issue.

In 1872, George Prentiss engaged in the business of the manufacture of lumber in Alpena, and took up his residence there in 1878. He continued this business until January or February, 1882, when the Prentiss Lumber Company was organized as a corporation, and this cor- poration continued the business of manufacturing lumber at Alpena from the date of its organization until on and after September 7, 1883.

In 1880, Greenbaum and Epsteyn, the defendants in this suit, entered into copartnership, and engaged in the business of selling clothing, at Alpena. They continued in such business until April 23, 1883, when they dissolved partnership. They had dealings with George Prentiss down to the time the corporation called "The Prentiss Lumber Company" was organized, and afterwards with such corporation; the total amount of sales being over $7,200. In such dealing they took the individual notes of George Prentiss while he was in business, as follows:

| | |
|---|---|
| April 14, 1881 | $1,081 89 |
| November 4, 1881 | 801 69 |
| Total | $1,883 58 |

They took the notes of the Prentiss Lumber Company as follows:

| | |
|---|---|
| February 15, 1882 | $   700 00 |
| April 3, 1882 | 867 85 |
| August 24, 1882 | 500 00 |
| December 18, 1882 | 1,014 43 |
| February 15, 1883 | 1,000 00 |
| April 23, 1883 | 1,162 76 |
| Total | $5,245 04 |

All of the foregoing notes were paid except that of
December 18, 1882, for $1,014.43, and that of April 23,
1883, for $1,162.76, both of which were afterwards
renewed, and are the notes involved in this suit.

From 1872 to February 1, 1883, George L. Maltz was
engaged in business at Alpena as a private banker, and
conducted it under the name of the "Exchange Bank."
On February 1, 1883, the Alpena National Bank was
organized under the act of Congress. Maltz owned less
than one-half of the stock in this corporation, and was
elected a director and president of the bank, and was its
financial manager. The note of date December 18, 1882,
was discounted by Maltz at his private bank on January
3, 1883, and was sold by him to the Alpena National
Bank soon after it organized, and was renewed by a new
note of date June 21, 1883, drawn by the Prentiss Lumber
Company, payable to the order of John C. Comfort,
cashier, and indorsed by Greenbaum and Epsteyn. The
note of date April 23, 1883, was discounted by the Alpena
National Bank on that day, and was renewed by the
parties on August 25, 1883. The original notes were dis-
counted for Greenbaum and Epsteyn, and they received
the avails thereof. They were not accommodation indors-
ers or makers, but they received the full consideration
expressed in the notes, less the discount. All sales of
goods for which the first-mentioned note was given were
made before the Alpena National Bank was organized.

This action is upon contract, brought on the promise
of defendants, Greenbaum and Epsteyn, to pay these

notes. The defendants have, by way of notice, set up three defenses, two of them founded upon what they allege as a fraud perpetrated upon them by George L. Maltz, as president and financial manager of the Alpena National Bank. While retaining the consideration for which their promises were made, they ask to be relieved from all liability, under their first defense, because Maltz, while yet a private banker, and before the plaintiff had an existence, made representations to them, as the president of the plaintiff bank, as to the credit and responsibility of the parties to whom they sold goods for which they took the notes discounted by them, and that Maltz, at the time of such sales, asserted that if they would sell to the Prentiss Lumber Company goods, and receive therefor the notes of the Prentiss Lumber Company, the Alpena National Bank would receive said notes, and discount the same, and look absolutely to the said company for their payment. And, in reliance upon such representations, they sold the goods, took the notes, indorsed them to facilitate collection, but with the understanding that such indorsement was without recourse, and without liability. There is no testimony in this record tending, in the remotest degree, to show that, at the time the sales were made by Greenbaum and Epsteyn for which the note of December 18 was given, such a corporation as the Alpena National Bank was ever thought or spoken of.

With these undisputed facts before us of the business in which the several parties were engaged, and with the dates of the several transactions in our mind, it is clear that the first defense set up cannot by any possibility be true. It is impossible that Mr. Maltz should, as the president and financial manager of the Alpena National Bank, have made the representations set up in the first defense. The allegation is that they were made to

induce Greenbaum & Epsteyn to sell goods to the Prentiss Lumber Company, and these sales were all made during the years 1881–82–83, and prior to the dissolution of the firm of Greenbaum & Epsteyn.  Mr. Greenbaum testified that the goods for which the note of December 18, 1882, was given, were all sold prior to November 28 of that year; and the note of April 23, 1883, was given for sales made between November 28, 1882, and April 20, 1883.  It is not claimed that, between the dates last given, any representations were made which induced defendants to sell goods upon crdit to the Prentiss Lumber Company.

Mr. Greenbaum was permitted, against objection, to testify to representations which Mr. Maltz had made to him of the credit and responsibility of the Prentiss Lumber Company in 1881 and 1882; and, also, that when he closed up business with the company, in April, 1883, Prentiss offered him a note to wind up the business, and that he did not care to take the note, and Prentiss told him to find out whether Maltz would discount it, and how the Prentiss Lumber Company stood, and that Maltz told him that he (Greenbaum) could take the note; there was no risk about it; the Prentiss Lumber Company was good, and worth over $100,000; that Maltz said he would discount it in the bank, and he (Greenbaum) would have to run no risk; that the note was all right; "that the Prentiss Lumber Company note is all right;" that he relied upon Maltz's statements, and took the note, and a few days after discounted it at the bank.  The admission of this testimony was not only a palpable, but it was pernicious, error.  The testimony as to the representations made at the time the note was taken, in April, 1883, was not admissible under the notice; and that with reference to representations made before the organization of the

bank, and before Maltz could possibly be its president and financial manager, was clearly inadmissible.

In the moral law, we read of visiting the sins of the fathers upon the children unto the third and fourth generations, under certain circumstances. But it is difficult to see how, if private-banker Maltz made any such representations as claimed respecting the credit of the Prentiss Lumber Company, and that the Alpena National Bank would, if such credit was extended, take the notes without recourse against defendants as indorsers, these could be laid at the door of the Alpena National Bank, organized long afterwards. This notice is not only inconsistent with the facts, but it is unsupported by the testimony to sustain that branch of the notice which asserts that, if such sales should be made upon credit, the Alpena National Bank would discount the notes, and look only to the Prentiss Lumber Company for its pay.

It is not necessary for us to decide whether an indorser of commercial paper can be permitted to show by parol that at the time his indorsement was made, and the paper transferred, there was an agreement that he should not be held liable upon his indorsement.

In the second defense, which is set forth above, there exists the same inherent difficulty. The gist of the defense is the fraud of Maltz, as president and financial manager of the Alpena National Bank, in entering into an agreement with George Prentiss, representing the Prentiss Lumber Company, that he (Maltz) should represent the company as entirely solvent, and in good credit, for the purpose of inducing Greenbaum & Epsteyn to sell clothing and gents' furnishing goods, and take therefor the notes of the company, Maltz knowing them to be absolutely insolvent; and, in pursuance of such agreement, representing the Prentiss Lumber Company as solvent, and worth $100,000 over and above all of their

liabilities, relying on which, they sold the goods upon credit. The only testimony introduced as to representations of Maltz concerning the credit of the company which induced the sale of goods upon credit was that of Mr. Greenbaum, and, as before stated, he testified that such representations, which induced the sale of goods on credit, were made in 1881 and 1882, as above stated. There is no testimony which tends in the remotest degree to support the claim asserted,—

"That there was an understanding and agreement between George Prentiss, representing the Prentiss Lumber Company, and George L. Maltz, representing the plaintiff in this suit, that Maltz, as president and general manager of the Alpena National Bank, should represent the Prentiss Lumber Company to be entirely solvent, and in good credit, for the purpose of getting credit, and of inducing the defendants to sell the company goods and take their notes therefor."

The only witnesses who testified upon that point were George Prentiss and George L. Maltz, and both denied that there ever was such understanding or agreement.

It must be further noted that there is no claim set up in this second defense, of fraud in obtaining the indorsements of Greenbaum and Epsteyn, or any inducement held out to them to indorse such notes. The only fraud alleged is—

1. The false representation of Maltz as to the Prentiss Lumber Company's credit, which induced defendants to sell the goods in the first instance.

2. A fraudulent agreement between Prentiss and Maltz that Maltz should represent the company to be solvent, and in good credit, for the purpose of inducing defendants to sell them goods, and take notes therefor.

The court, however, permitted testimony by Mr. Greenbaum, against the objection of plaintiff's counsel, of what Mr. Maltz said at the time the indorsements were made

upon renewing the original notes, and also as to what was said a few days previous to the giving of the original notes. This testimony was, substantially, as follows:

That, in 1881 and 1882, Greenbaum and Epsteyn sold goods to George Prentiss, and took his notes, and after the Prentiss Lumber Company was formed they continued to do so; that the notes were payable to the order of Greenbaum & Epsteyn, and, after finding out if the bank would take them, they negotiated them at the bank; that when the firm dissolved, in April, 1883, the company was indebted to them, and they went to get their pay; that Prentiss, the president of the company, told them he could not pay them then, and referred them to Maltz about the solvency of the company before they took the note; that Greenbaum went to Maltz, and told him Prentiss offered him a note to wind up the business with the firm, and that he did' not care to take the note, and that Mr. Prentiss told him to find out whether Maltz would discount it, and how the Prentiss Lumber Company stood; that Maltz told him that he could take the note; there was no risk about it; the Prentiss Lumber Company was good; that it was worth over a hundred thousand dollars; that the bank would discount it, and he would run no risk; that the note was all right, and the Prentiss Lumber Company was all right; that he relied upon what Mr. Maltz told him, and that, had it not been for the representations then made by Mr. Maltz, he would not have taken the Prentiss Lumber Company note.

That, just prior to the notes being renewed, he had a conversation with Maltz as manager of the bank; that he refused to indorse the renewal notes until Maltz told him the same thing,—that the Prentiss Lumber Co. was good, and he ran no risk, and that the renewal was only for the accommodation of Prentiss; that he could not pay it

then, and would pay the interest; that the same thing occurred with reference to both renewals, and that he would not have renewed the notes, had not Maltz made those representations, upon which he relied; that he had no recollection of any conversation with Maltz at the time the notes were discounted, or when the renewals were made, but that these conversations were prior to those events; and that he had no conversation with Mr. Maltz at the time the notes in suit were indorsed.

This witness was examined, cross-examined, re-examined by his counsel, and again cross-examined by counsel upon the subject of the representations made by Mr. Maltz. The result of the whole is substantially stated above, with the exception that he stated upon a cross-examination that he did not apply to Mr. Maltz when Greenbaum & Epsteyn were selling the goods, but he did prior to taking the original note; that several notes, both of George Prentiss and the Prentiss Lumber Company, had been taken for the goods sold to the company, and had all been paid, except the two of which the notes in suit were renewals.

The court erred in his instructions as follows:

"Now, gentlemen, it cannot be disputed, under the evidence, that these representations, to which I have called your attention as being representations within the proper definition of the same, if they were used and made by Mr. Maltz, were untrue at the time."

It was not only disputed that Mr. Maltz made the representations, but it was disputed whether, if made, the representations were untrue. We may say that it appears beyond dispute that down to September 7, 1883, the Prentiss Lumber Company was in good credit, and was carrying on an apparently prosperous business. It was largely in debt, but it also had large assets; and, according to a statement made by Prentiss a few days prior to

September 7, 1883, and put in evidence by defendants, its assets amounted on August 24, 1883, to $364,393, and its liabilities to $213,000, showing a balance of assets over liabilities of $151,393. No testimony was introduced to impeach the good faith of Prentiss in making this statement.

The defendants also introduced in evidence the annual report of the Prentiss Lumber Company for the year 1882, which showed assets at $210,172.91, and liabilities, $86,261.10; leaving a surplus of $48,886.81, after repayment of capital stock of $75,000, or a surplus of $123,866.81 as regards creditors of the company. The Alpena National Bank had, during the year 1883, made direct loans to the company of about $11,000; and Maltz, individually, had loaned it about $13,000. Five thousand of this sum Mr. Maltz had loaned on September 4, 1883. Neither the bank nor Maltz held any security for these loans, although Mr. Prentiss had said on two different occasions, when obtaining such loans, that he would give security if they asked it, or at any time when they would ask it; a statement not unusual between a customer and his banker.

During the summer of 1883 the Prentiss Lumber Company met with losses that aggregated about $64,000; and in the latter part of August it became aware of the extent of its losses, and it concluded to give the mortgages in question. It turned out, as is generally the case in winding up under the mortgages, and from a stoppage in business, that there was a great shrinkage between the values of the assets, as estimated by the company, and the price actually obtained on a sale and disposition of them by the trustee; but the evidence in the case did not justify the charge of the court in the remarks above quoted. Laying out of view entirely the testimony of Mr. Prentiss and of Mr. Maltz contradicting the state-

ments of the witness Greenbaum, I do not think there is testimony in the whole record that warranted the court in submitting to the jury the question whether Mr. Maltz made to the defendant Greenbaum any false or fraudulent representations whatever. Fraud, in order to be actionable, requires proof. If representations were made, either falsely or negligently, it is not sufficient to show that the representations were made, but it must be proved that the representations were false.[1] This the defendants failed to do. I have reference now to the time when the notes of which the notes in suit were renewals were executed, and when defendants' liability first arose upon their indorsement.

The first error assigned upon the ruling of the court upon the admission of testimony relates to the introduction in evidence of a statement of the assets and liabilities of the Prentiss Lumber Company, dated August 24, 1883, and first shown to Mr. Maltz on the evening of September 7, 1883. This statement showed the assets to be $364,393, and the liabilities, $213,000; leaving a balance of assets over liabilities of $151,393. There could be no prejudicial error in admitting this statement. Its tendency was favorable to plaintiff. It showed that by the estimate and valuation placed upon the property of the company it was solvent, and that its assets largely exceeded its liabilities; and there is nothing in the testimony to show that Maltz knew, or had any reason to believe that the Prentiss Lumber Company was not solvent and in good credit down to September 7, 1883, when he was told by Prentiss of the embarrassment of the company. It had a tendency to rebut the fraudulent intent which the defendants claim Maltz had in representing the company solvent and in good credit.

The defendants' counsel asked the witness Maltz, upon

---

[1] See *People v. Reynolds*, 71 Mich. 343.

cross-examination, whether he had some stock in the
Prentiss Lumber Company, and he answered that he did
not. He was then asked if $30,000 worth of stock was
not carried along upon the books of the Prentiss Lum-
ber Company for a year or more. He answered that he
did not know. He was asked if he did not see it upon
the books of the company upon the other trial of the
case. He replied that he saw the item, but did not
know what it was for. He further testified that the sec-
retary of the company, a Mr. Billings, came to the bank,.
and desired to place $30,000 of stock in his hands, which
he refused. He was asked why he refused it, and he
replied that he did not desire it, that was all, from the
fact that at that time he did not want to be considered
a stockholder. Counsel then asked:

" Why didn't you want to be considered a stockholder? "

He replied:

" Because I was not going to put any money in that.
institution."

The following questions and answers were then asked
and given:

" *Q.* About that time you were representing the Prentiss.
Lumber Company to be good and solvent, were you not?
" *A.* I believed then so, believe so still.
" *Q.* And, while you were making these representations,.
you did not want to be regarded as a stockholder with
them? "

Counsel for plaintiff interposed an objection on the
ground that it was incompetent and irrelevant. Plaintiff's
counsel stated why he considered the testimony as irrele-
vant and incompetent; the principal reason being that, if
such representations were made, they were not within the
scope of the authority of Maltz, as president of the bank,
to make. The court, in deciding upon the admissibility
of the testimony, stated to counsel as follows:

"So far as this point is concerned, I understand the object of the testimony, generally, to be an offer to show that while the plaintiff held the notes for which the notes in suit were given as renewal, and upon the question being presented of the proposed renewal, and the re-indorsement by the defendants, being referred by the Prentiss Lumber Company, the principal maker, to the bank, or to Mr. Maltz, its president, Greenbaum went to Maltz; that Maltz, knowing the situation, and his bank having the notes for which these notes were given in renewal, and knowing that it was proposed to make these renewals in this way, by the indorsement of Greenbaum, made the statements to Greenbaum with reference to the responsibility of the Prentiss Lumber Company which you propose to introduce in evidence.   Is that correct?"

Counsel for defendants, Mr. Shields, replied:

"I think that is a fair and accurate statement of it."

The court then said:

"Now, I am inclined to think that that testimony is admissible, at least within the limits I have stated; and I shall admit it.   I think it quite distinguishable from the case of an agreement or statement on the part of a bank officer that an indorsement which it is proposed to make will not be insisted upon.   This goes to the question of fraud in procuring an indorsement; not an agreement that a valid indorsement, upon its face, should not be enforced.   It is not a question of an attempt to vary the conditions of a written agreement; but it is a question of fraud in the procuring of a written agreement; and it seems to me that the bank, if it procured, by fraud of its active agents in doing the business, the indorsement of Mr. Greenbaum upon this paper, cannot assert the legality of Greenbaum's indorsement upon the paper against its own fraud, or the fraud of its active officers, in procuring the indorsement.   At least, within the limits I have indicated, I will allow the examination."

Although no answer was given to the question asked, yet, as the rule laid down by the court was acted upon to a large extent in the subsequent course of the trial, in the admission of testimony, and in his instructions to the jury, we may determine the correctness of such

rulings upon this exception better than to take them up *seriatim*. If this testimony was admissible at all, it must have been under the issue raised by the second defense, above set forth. The theory and gist of that defense is that fraudulent representations were made by Maltz respecting the credit and responsibility of the Prentiss Lumber Company to the defendants, whereby they were induced to sell goods to that company, and take the company's notes therefor. Aside from the conspiracy clause, which is not attempted to be proved, this is the gist of that defense. There is not one word about false representations made by Maltz, subsequently to Greenbaum & Epsteyn's taking the notes, to induce them to indorse such notes, or a renewal thereof. The point of the judge's ruling is that the testimony was admissible to show a different fraud from that alleged,—in fact, to show a fraud not alleged,—relating wholly to representations made after the original notes were given, and while they belonged to the bank, which induced Greenbaum to indorse such renewal notes. I think such testimony was not admissible, under the pleadings.

In *Bourreseau v. Evening Journal Co.*, 63 Mich. 437, Chief Justice CAMPBELL, speaking for the Court, said:

"The practice is settled in this State, as at common law, that it is not competent to prove distinct facts in defense that have not been made part of the issue as framed. No one can be prepared in advance to anticipate every fact, true or false, which may be offered in evidence, and of which he has had no notice."

I am also of the opinion that, if the original notes were free from taint when the bank became the purchaser thereof, they could not be rendered void or worthless by what transpired at the time they were renewed by giving the notes in question. The renewals merely continued the original contracts in force during the period to which

the time of payment was extended. The notes, originally, were not sold to the bank or discounted for the benefit of the maker. Greenbaum and Epsteyn were not accommodation indorsers. They sold the notes to the bank, and received the consideration. While this was the situation, the notes, upon their face, disclosed the fact that Greenbaum and Epsteyn occupied the relation of sureties to the maker; and the bank was therefore bound to respect their rights as sureties. It could make no change in the contract, to the prejudice of the sureties, without their consent. The only change made in the contract was an extension of time of payment, to which the sureties assented. They claim that the request for extension was made by the maker, and that they gave their assent by reason of the representation of the holder that the maker was good. If the representations were made to induce the indorsement of the renewals, and were false, how are the indorsers damnified? They claim that, if the extension had not been made, they would have been in a position to collect their debt by suit from the maker. To do this, they would have had to pay the notes to the bank, and then brought suit in the circuit court; and how is it made to appear that, before the judgment could have been obtained, the failure would not have occurred, and the property sold or mortgaged to other *bona fide* creditors? If the renewal notes were of no validity, the original notes remained in full force, and the indorsers were liable upon them. In other words, the representations, under the facts of this case, are not a defense which goes to the validity of the contract of indorsement; but, if it has any merit, it only goes to a recoupment, under proper pleadings, to the extent of the injury actually suffered by reason, or on account, of extending the time for payment.

The court erred in permitting defendant Greenbaum to

testify to conversations which he had with Maltz, after the execution of the mortgages, to the effect that sufficient property was covered by the mortgages to pay all of the debts secured thereby, and that he need not have anxiety about his liability upon the notes in suit. Such testimony was irrelevant to any issue made in the case. The court admitted it as tending to show payment. It could have no such tendency, and was extremely prejudicial. No claim was made that Maltz had not sold all of the property covered by the trust mortgages, or that the total amount realized from such sales was not, as he testified, the sum of $112,320.33. This being so, the jury had no right to weigh his opinion of the value of the security against the results reached by a conversion of it into money, as evidence showing payment of the notes.

It was error, also, for the court to permit the witness Greenbaum to testify, against plaintiff's objection, to the effect that, if Mr. Maltz had not told him that he had sufficient property to cover the notes and pay them, he would have taken steps to collect the debt out of other property of the Prentiss Lumber Company. This testimony had no relevancy to the issues being tried. Its only effect could be to prejudice the jury against the plaintiff, by drawing the attention of the jury away from the issues involved, and to lead them to think that defendants were injured by statements made by Maltz, but for which the plaintiff was in no way responsible. Such testimony was also inconsistent with the defendants' theory of the case. That theory was that defendants were not liable at all upon their indorsements, by reason of the fraud practiced by Maltz in procuring them. This testimony of Greenbaum recognizes their liability, and seeks to establish a discharge from liability by matters ex post facto.

The testimony of Andrew W. Comstock should have

been excluded. He was a banker at Alpena. This leading question was asked him:

"In that conversation, did you say to him, in substance, that the Prentiss Lumber Company was bad, and soon would fail?"

The question refers to a conversation which the witness claims he had with Mr. Maltz in the spring of 1883, the date of which he does not fix. He replied that he did. He kept on discounting the notes of the Prentiss Lumber Company brought in by his regular customers, whom he knew were good. Whether he apprised his regular customers of the same advice he so kindly tendered to Mr. Maltz he does not state. The testimony was not admissible as evidence of the fact that the Prentiss Lumber Company was bad; for it is his opinion, merely, both of its badness, and that it would soon fail. He disclosed no knowledge of its affairs which would warrant him in expressing such opinion; and, if it was offered as notice which should have put Maltz upon inquiry, it should have been made to appear that the conversation was prior to April 23, 1883, when the second of the original notes bears date.

I am of opinion that the court erred in submitting the issues raised by the third defense to the jury. Both Mr. Prentiss and Mr. Maltz testified that there was no understanding or agreement between them that the bank should have security for the money loaned to the Prentiss Lumber Company by it whenever it requested such security.

Mr. Prentiss testified that he casually remarked to Mr. Maltz at one or two times, when borrowing money:

"'Any time you want security on these direct loans, I will give it to you.' On one of these two occasions, I added: 'I will hold the mill property to see that you are taken care of.' That was all the agreement, and all the understanding, in those same two remarks of mine.

Mr. Maltz never asked it, nor was there any further con-
versation about, or reference made to, it."

The witness was asked:

" Q. Did George L. Maltz, or the Alpena National
Bank have any security on any property of the Prentiss
Lumber Company on the 23d day of May, 1883?

" A. I don't remember that they did. Mr. Maltz had
my word that I would, for money that he and the bank
might advance, hold the mill property for security for it.
He had my word for it, and nothing else."

Mr. Maltz testified upon the subject as follows:

"Q. Had you, or the Alpena National Bank, any
security in the summer of 1883?

" A. No, sir.

"Q. Had you assurance from the Prentiss Lumber
Company that, when asked for, you should have security?

"A. Yes, sir.

"Q. And when were those assurances given you?

"A. Mr. Prentiss said, any time I wanted security, he
would give it to me.

" Q. Give it to you, or to the bank?

" A. I don't know whether it was to the bank or not.
It was in a conversation with me.

"Q. Whatever advances you made, of course, would be
in behalf of the bank?

"A. Yes, sir.

"Q. So that this security talked about was intended to
be given to the bank whenever asked by you?

"A. Yes, if I wanted any additional security.

"Q. In point of time, when was this assurance given
you?

"A. I suppose I could have it at any time.

"Q. That was the understanding and agreement with
you, all the way from 1883, was it not?

"A. There was no agreement; but, if I should go to
him, and want security, he would give it to me.

"Q. You had that understanding and assurance from
Mr. Prentiss from the beginning of the Prentiss Lumber
Company, had you not?

"A. It may be. I don't remember distinctly about it."

The foregoing is, substantially, all of the testimony
from which it is claimed the jury would be warranted in

finding that there was a secret agreement which had the effect to discharge the indorsers, and forms the basis for the following instructions of the court to the jury:

"As to the defense based upon alleged secret agreement, the defendants claim as a defense, substantially, that, at and previous to the time these indorsements were made, there was a secret understanding between the plaintiff (made for it by its president, Mr. Maltz) and the Prentiss Lumber Company that, whenever the plaintiff should ask or demand it, the lumber company would give security upon its property, or turn the same over absolutely to the plaintiff or Mr. Maltz, as its general officer, to satisfy any claim the bank might have, and that the transaction of September 7, 1883, was the execution of that agreement; that when the defendants made the indorsements in question the Prentiss Lumber Company was largely indebted to plaintiff; that these facts were concealed from the defendants when the defendant Greenbaum consulted Mr. Maltz as to the prudence of making the renewals in question; and that if they had been disclosed to him at those times, and on those occasions, he would not have made the notes or the renewals.

"Now, gentlemen, to maintain this defense, the defendants have the burden of showing, by the preponderance of the evidence, every fact essential to constitute it.    It must appear from the evidence that such an agreement or understanding existed, as a matter of fact, at the time the indorsements in question were made.    If there was no agreement or understanding, the basis of his defense is wanting.    It need not have been in writing, or even put into any distinct form as to details, but the substance of it must have been understood between them.    The minds of Mr. Prentiss and Mr. Maltz must have met upon it, and they must have made it the basis of their action; and the two mortgages of September 7, 1883, must have been made in pursuance of it.    It must also appear that before asking the indorsements, and while the alleged agreement existed, Mr. Greenbaum applied to Mr. Maltz for information upon which to determine whether or not he should indorse these renewal notes."

There is nothing in the testimony tending to show a secret agreement which was a fraud upon the creditors of the Prentiss Lumber Company.    Nor is there any prin-

ciple of law which made it the duty of the Alpena National Bank to disclose to such creditors the fact that the Prentiss Lumber Company was a debtor to the bank, and that it had offered to give security whenever requested. There are no such overstrained and refined relations between a bank and its customers. Good faith and fair dealing is all that is required of a creditor in his transactions with a debtor who occupies the position of surety to a contract. Good faith and fair dealing do not require the creditor to inform such surety of other and independent transactions with the principal debtor. The notice of the third defense does not set up that any representations were made to induce Greenbaum to take notes, or renew notes already given; but it relies on a fraudulent concealment of the indebtedness, and the agreement to secure it, if requested. To hold that, when an indorser of a note applies to have it discounted for his own accommodation, the silence of the bank or purchaser as to the indebtedness of the maker of the note to him, and of the maker's assurance that he will give security if required, is a fraud upon the indorser which will enable him to keep the consideration received for the note, and discharge him from all liability, is a doctrine too palpably absurd for serious consideration.

The testimony of Mr. Maltz is to the effect that the bank was not intended, by the transaction in which security was taken, to be a trustee, and in this he is supported by Mr. Prentiss; and there is nothing in the testimony contradicting their statements. It has never assumed to act as trustee, while Mr. Maltz was named as trustee in the instruments creating the trusts, and has acted as such. He was asked:

"Since the giving of the mortgage referred to, and the real-estate mortgage, state whether or not the Alpena National Bank, through its officers or directors, as such,

have assumed to have anything to do with the controlling or disposal of that property."

He replied:

" The Alpena National Bank has had nothing to do with the disposal of the property, or the control, or anything connected with the trust."

He further testified that he alone had the exclusive management and control of it; that the bank was in no way connected with, or interested in, the mortgaged property, or in the transaction, save as a creditor; and that the money into which the property had been converted remained in his hands subject to distribution as a trust fund.

It appeared when the case was here before that all money collected by the trustee had been paid over to the bank, and that there was a sufficient sum paid to satisfy all claims secured by the mortgages. Upon that state of facts, we held the notes in suit satisfied; for, if plaintiff was allowed to recover under such circumstances, defendants would be entitled to the benefit of the money paid into the plaintiff's hands for the purpose of discharging these claims. It now appears that the trustee paid into the bank, from the money collected, sufficient to pay the claims preferred in the mortgage over the last class, which embraces the claims in suit, and for the money properly applicable to the payment of the last class of claims he held certificates of deposit in his own name. Under these facts, as they now appear, the bank cannot be held as a trustee of these creditors to the amount of money so deposited. To hold the bank as trustee, simply because its president and financial manager was a trustee for the benefit of creditors, would operate harshly and unjustly upon the rights of a majority of the stockholders of the bank, and make them pecuniarily responsible for acts which neither they nor the board of directors of

the bank ever authorized or assented to, and would unjustly condemn them to losses concerning which they have never had a hearing in a court of justice. I cannot reconcile the idea with due process of law.

If it be true that enough money was not realized to pay all classes of creditors mentioned in the mortgage in full, then Mr. Maltz was justified in not making a *pro rata* distribution until the question of the validity of the defendants' indorsement should be determined. If these defendants are not entitled to be discharged absolutely from all liability by reason of the fraud and deceit set up in their notices under the general issue, which, by this record, we do not think they have maintained by legal and proper testimony, the proper method for them to pursue would be, if they believed the trustee has not faithfully executed his trust, to file a bill in chancery for an accounting, in which suit the whole matter of the proper execution of the trust can be gone into, and the trustee charged with all proper items. The bank can be made a party defendant; and, if a proper showing can be made, it can be enjoined from the further prosecution of this suit until such accounting is had.

The judgment of the circuit court should be reversed, and a new trial ordered.

LONG and GRANT, JJ., concurred with CHAMPLIN, C. J.

MORSE, J., (*dissenting*). When this case was here before, the testimony of George L. Maltz, the principal manager of the plaintiff, and its chief witness, carried the impression and conviction to us that there was deposited in the plaintiff bank sufficient funds derived from the trust mortgages, of which Maltz was trustee, to pay in full the class of notes to which these in suit belonged. We were strengthened in this conviction by the brief of plaintiff's counsel, which plainly carried the same impres-

sion. We then held that the money thus received on these mortgages by Maltz, and held by him on deposit, in his individual name, in the Alpena National Bank, was, by the terms of his trust, applicable to the payment of these notes, and must be so applied; that the money belonged to the bank, to be applied for this purpose, and in law would be considered as so applied. We then understood, as the case appeared in the record, and as it was argued, that such application was refused, not because there were no funds left from the trust to pay the notes, but because the bank entertained the idea that it could not apply the money in Maltz's hands, and deposited in his name, until he saw fit to pass the money over to the bank, which it claimed had not been done.

Under these circumstances, we held that, when the means were in the hands of the president and real manager of the bank, Maltz, and needed only entries on the proper books to transfer the account, the bank had no right to delay such action, and was bound to collect and apply the money. We further said, in reversing the case and granting a new trial, that there was no occasion or reason for going through another trial, which would be a wrong to defendants, who ought not to be harassed further. *Alpena Nat'l Bank v. Greenbaum*, 74 Mich. 157. A motion for rehearing was subsequently made; but, upon such motion, we saw no reason for changing our views entertained at the first hearing. Id. 159. Since then a change of venue has been taken to the Ingham circuit court, and a trial there had, resulting in a verdict for defendants. The plaintiff now comes to this Court, alleging certain errors upon the trial.

The counsel for the defendants, in his argument here, first meets these assignments of error by the contention that the testimony upon the second trial was substantially

the same as upon the first, and is therefore governed by
the law as laid down by us when the case was first here.
But I am satisfied, from the record of the last trial, that
the plaintiff attempted, in view of our opinion, to claim
that there were not sufficient funds derived from the
mortgages to pay the class of indebtedness in full to
which the notes sued upon belonged; and Maltz testified
on this trial that February 15, 1886, there was paid over
to the bank by himself, as trustee under these mortgages,
the sum of $13,842.65, to apply on the last indebtedness
specified in said mortgages, to wit:

"Also, the remainder of the indebtedness to the Alpena
National Bank, about the sum of $59,000, and arising
from paper of first party held by said bank."

It will be remembered that this suit was brought by
the Alpena National Bank, against the defendants, upon
two certain promissory notes made by the Prentiss Lumber
Company to the order of John C. Comfort, cashier of
said bank, which notes were indorsed by the defendants.
These notes came under the provision of the mortgages
from the Prentiss Lumber Company to Maltz, as trustee,
and therefore, when upon the stand as a witness for the
bank at the last trial, Maltz testified that the propor-
tionate share of this $13,842.65 to be indorsed on these
notes as of the date of February 15, 1886, would be
$273.35 upon one, and $309.79 upon the other; that the
indorsements had never been made, but that the bank
now made it as of the date above; that it had not been
indorsed before because he did not suppose it could be
done until after the decision of the Supreme Court after
the first trial.    He computed the balance due upon both
of the notes after such indorsement, and at the date of
the last trial, to be $2,473.87; and the plaintiff claimed
judgment for this amount.    Maltz also testified that he
received, all told, in money, from the property described

in the mortgages, the sum of $112,320.33.   He paid all the indebtedness under his trust in full except this last class of $59,000.

The mortgages specified the following indebtedness to be paid out of the proceeds of the property mentioned in, and conveyed by, the mortgages, and in the order named, to wit:

| | | |
|---|---:|---|
| George L. Maltz | $ 13,000 | 00 |
| Labor account | 10,000 | 00 |
| Alpena National Bank, direct loans and paper indorsed by A. R. & W. F. Linn or George Prentiss, estimated, about | 21,535 | 75 |
| Perry Prentiss | 1,500 | 00 |
| Hubbell, Brown & Co | 2,000 | 00 |
| Pierce & Coleman | 7,500 | 00 |
| Mary C. Prentiss | 2,700 | 00 |
| Rectina P. Chase | 186 | 00 |
| Last Class | 59,000 | 00 |
| Total | $117,421 | 75 |

The mortgages, two in number, were dated September 7, 1883, and provided that interest at 7 per cent. per annum should be paid on these sums until paid.   It is contended by the counsel for defendants that the evidence shows that George Prentiss, of the Prentiss Lumber Company, himself paid the paper indorsed by A. R. & W. F. Linn & Co., which in one of the mortgages is stated to be the sum of $3,035.75, and that there is also evidence showing that the amount of the indebtedness to which the notes in suit belonged amounted only to $50,910; that this evidence is found in Maltz's testimony, where he states the notes held by the bank under that class. It is also claimed that Maltz's testimony shows that the amount of the direct loans of the bank to the Prentiss Lumber Company was only $11,000; that this testimony, with the testimony of Prentiss that he paid the paper indorsed by the Linns, reduces the item of—

| | |
|---|---:|
| $21,535.75 to_____ | $11,000 00 |
| Add Maltz's claim_____ | 13,000 00 |
| Labor account_____ | 10,000 00 |
| Prentiss, Hubbell, Brown & Co., Pierce & Coleman, Mary C. Prentiss, and Chase_____ | 13,886 00 |
| Last Class, instead of $59,000_____ | 50,910 00 |

| | |
|---|---:|
| Makes total of claims to be paid by Maltz, not counting interest_____ | $98,796 00 |

Maltz admits that he received in actual cash, and paid into the bank, $112,320.33. Upon examining the record, I find that Prentiss testified that he paid A. R. & W. F. Linn, but that the amount so paid was not over the $3,035.75 mentioned in the second mortgage. There must have been, from Maltz's and Prentiss' testimony, other paper, indorsed by the Linns or George Prentiss, that was not called "direct loans." It is true that Maltz swore that the direct loans only amounted to $11,000, but we do not think that this is all that the bank should be credited with as belonging to the $21,535.75 item. In the first mortgage the direct loans and paper indorsed by the Linns and George Prentiss were estimated at $21,535.75, and the other indorsed notes at "about $59,000;" making a total of paper held by the bank of $80,535.75. In the second mortgage, it is stated differently, to wit:

| | |
|---|---:|
| Indebtedness to Alpena National Bank_____ | $77,500 00 |
| A. R. & W. F. Linn_____ | 3,035 75 |

| | |
|---|---:|
| Making same total as above_____ | $80,535 75 |

From the evidence in behalf of plaintiff, we can only deduct the Linn matter, $3,035.75, from the $21,535.75, leaving $18,500 on this item, or $7,500 more than claimed by defendants' counsel.

As to the notes belonging to the $59,000 class, Maltz stated on direct examination, in rebuttal of defendants' case, that he computed that on February 15, 1886, they amounted, interest and all, to $59,601.27, about $25,000 of which sum was contested, and in suit against the dif-

ferent indorsers; but on cross-examination, when called upon to give the respective face amounts of these notes in detail, they foot up only $23,445. He states that he has given them all, and that they amount to $27,000. In making this last statement, he must have meant that the interest and principal amounted to this latter sum. He then goes on and gives the face amount of all the remaining notes in this class, which foot up, as I add them, a total of not over $27,280, making a total of $50,725; but I will call it $50,910, as figured by defendants' counsel. Adding $7,500 to the counsel's total of $98,796, I find the face value of the indebtedness to be paid under these mortgages to be $106,296. This deducted from the $112,320.33 deposited by Maltz with plaintiff, there is left the sum of over $6,000 to be used on interest account. This ought to have taken care of the interest. The proofs show (Maltz's testimony) that the lumber, $37,998.02, was sold, and the cash received, in September, October, and November, 1883, and May, 1884. The logs—$36,638.55—were sold, and cash received, in October, November, and December, 1883, and in 1884 and 1885. These moneys should have been applied on the debts, in their order, as fast as received.

It must be remembered that these mortgages were made September 7, 1883, and Maltz testifies that this bank paper was not all due at that time. The notes had been discounted, and there was no interest upon them until due, and some of them were four-months notes. It is not probable that any interest was paid on the labor account of $10,000. It also appears from Maltz's testimony that many of these notes belonging to the $59,000 class were paid when due by the indorsers,—at least the sum of $9,500,—upon which no interest has ever run, the bank having had the use of the money ever since. Maltz testifies as follows:

" *Q.* So, during all that time, from the first sale of lumber, this money was in the Alpena National Bank, was it not?

"*A.* Yes, sir; under my care.

" *Q.* In use by the bank?

" *A.* Yes, sir,"—showing that, as fast as he collected this money under these mortgages it was placed in the bank, and used by plaintiff; and yet he also swears:

" *Q.* And, after all, you have charged up here interest on these accounts from the 7th of September, until the 15th day of February, 1886, have you?

" *A.* I did."

I am not entirely satisfied with the case as it was made in the circuit court.    Mr. Maltz showed by his own testimony that he had received over $112,000 in money from these mortgages,—more than enough to pay all the indebtedness secured.    Under our ruling in the case when it was here before, the money so received, although credited to Maltz's personal account, was considered as belonging to the bank, to be applied on its debt.    This must remain the law of the case.    Therefore, the burden was on the plaintiff to show that the debts amounted to more than the money received, or some other good and sufficient reason why the $112,000 was not sufficient to pay the whole indebtedness.    Mr. Maltz, as a witness, was speaking for the bank; and he testified on the last trial that he was not only president, but the manager, of the bank; and that when he was present he controlled its daily business.    As a trustee under these mortgages, and as the manager of the bank, it was his duty to show what payments he had made, and when, under such trust. Instead of that, he contents himself with stating that he has paid in full all the indebtedness excepting this $59,000 class, and that has left only about $13,000 to pay on that.    Plaintiff's counsel contend that it was not the duty of the bank to show that Maltz had performed his trust, or how he had performed it; but I think differently.

The money, as collected, was paid into the bank, and was disbursed through the bank; and the plaintiff's own books would show the whole transaction.    We held before that when the money was paid into the bank it belonged to the bank, and was its money, and that it was its duty to at once apply it to the payment of its debts.    I am not inclined to now hold differently.

No explanation is given why there is now a deficit of over $40,000 in this fund, or where it has been applied. Mr. Maltz simply appears upon the stand as a witness for the bank, and testifies that "the trustee" (himself) has paid over only $13,842.65 to apply on this class of indebtedness, and that was the balance left in his hands to so apply after paying the other indebtedness in full. The counsel for the plaintiff appreciate the situation, and in their supplemental brief and argument admit that there was no effort in the court below to arrive at a fair and full accounting, because the plaintiff claimed it was not competent to do so, and the defendants did not attempt it; and it is then suggested that this balance might have been used by the trustee in paying off prior incumbrances and liens upon the trust property. The counsel then proceeded to state, as upon their personal knowledge, the expenditures of Maltz in the performance of his trust, to wit, $36,457.36, for taxes, counsel fees, insurance, and the relieving of liens upon the property, and also that the debts paid in full amounted to nearly $4,000 more than appears upon the face of the mortgages. But Maltz or the plaintiff failed to make any such showing upon the trial, or even to hint at it.

I can see no good reason why a trustee who has honestly and faithfully performed his trust should hesitate to account fully and freely to the beneficiaries of such trust, and in law there is none. The defendants in this case were interested in the fund derived from these

mortgages, and entitled to know what had been done with the moneys collected therefrom. The books and all the *data* showing the collection and disbursements of this fund were in the hands of Maltz and the bank; and the defendants could have but little, if any, information in regard to these moneys, and whether or not they ought to pay anything upon these notes, or, if anything, what amount, except through Maltz and the bank. The facts in this case show over $112,000 in the hands of the bank, to be applied for a specific purpose. The knowledge and information as to what has been done with this money is entirely with the bank, and its agents and officers. The bank is in full possession of all the proof to show that this money has been rightfully expended, and how; and, failing to make this showing, the law will not presume that they have done so. *People v. Swineford,* 77 Mich. 573.

This is a stronger case, at law, than the one above cited; for here not only is the money shown to have been in the hands of the bank, but the burden of proof rested upon the plaintiff to show that this fund was not sufficient to pay these notes sued upon in full, and why it was not sufficient. But this it signally failed to do; and the bare assertion that only about $13,000 was left to apply on the $59,000 class of notes will not do, unless the deficiency between the $112,000 and the face of the debts mentioned in the mortgages is satisfactorily accounted for. This has not been done, by any means, nor has any attempt been made to do so; but, on the contrary, such a showing has been studiously avoided, not only on the last trial, but from the very beginning of this litigation. When the money was all collected, on February 15, 1886, nor at any time thereafter, was any showing of the disposition of this fund made to the defendants; but suit is brought against them for the full amount of the notes

and interest, and no hint even given them that there was any indorsement to be made upon them. And yet Maltz now testifies that they were on February 15, 1886, entitled to the indorsements made on the last trial, and so entitled long before the time of bringing this suit.

The bank obtains judgment on the first trial for the full amount of said notes and interest,—some $600 more than it now admits it ought to have had; and, had the case not been appealed to this Court, the judgment would, for all we know, have been collected of defendants. The judgment is reversed by this Court, with a pretty plain intimation that we can see no reason, upon the showing then made, why the defendants should be further harassed. The suit is, however, tried again; and yet no accounting made that is "fair and just," as admitted by the plaintiff's counsel upon the argument here. I do not think it is necessary to give the plaintiff a new trial, that it may now make the accounting which it has hitherto refused or neglected to do. From the plaintiff's own witnesses, I think it is shown by this record, beyond cavil, that the bank has received more than sufficient money upon these mortgages, had it been properly applied as fast as received, to pay the whole indebtedness secured by them, and that no explanation has been given why such money did not pay the entire debt so secured.

The case stands practically as it did before; and the jury rightfully found, under the law as laid down by this Court, that the notes sued upon were paid in full before suit brought. As the circuit judge would not have erred had he, at the close of the trial, directed a verdict for the defendants, the allegations of error assigned are immaterial. If any errors were committed as claimed, none of them could possibly have affected the result. None of them went to the main question of the payment of these notes, and the verdict of the jury can

well be sustained upon plaintiff's own showing, independently of any testimony introduced on behalf of defendants.

I read the record differently from my brethren; or, rather, come to a different conclusion from reading it. I cannot divest myself of the conviction that, in this whole business, George L. Maltz and the Alpena National Bank were practically one and the same, and that it should be so treated at law. This was the conclusion we all arrived at upon the first record, and the second reading of the case here has but confirmed my first conviction.

The judgment ought to be affirmed.