**ROBESON et al. v. FANELLI et al.**

United States District Court
S. D. New York.

Nov. 10, 1950.

See also, D.C., 91 F.Supp. 251.

O. John Rogge, Michael B. Atkins, Bella Abzug, Alfred L. Tanz, and William L. Patterson, all of New York City, for plaintiffs.

Harry G. Herman, County Attorney of Westchester County, White Plains, N. Y., for defendants Gerlach, Fanelli and Ruscoe.

Nathaniel L. Goldstein, Atty. Gen. of New York State, for defendants Gaffney, Glasheen and Johnson; John P. Powers, Asst. Atty. Gen., of counsel.

Samuel Slutzky, of Peekskill, N. Y., for defendant Slutzky.

James J. Hanrahan, of Peekskill, N. Y., for defendants Boyle and Associated Veterans Council.

Cyril T. McDermott, of Peekskill, N. Y., for defendant McDermott.

Robert E. Dempsey, of Peekskill, N. Y., for defendant Flynt.

John J. O'Neil, of White Plains, N. Y., for defendant Zimmer. Newman Levy and George J. Mintzer, of New York City, of Counsel.

Bleakley, Platt, Gilchrist & Walker, of White Plains, N. Y., for defendant Field.

Leonard J. Rubenfeld, of Peekskill, N. Y., for defendant Rubenfeld; William F. Bleakley and James D. Hopkins, of White Plains, N. Y., of counsel.

RYAN, District Judge.

Plaintiffs, twenty-eight in number, seek by their complaint damages aggregating $2,020,000. as the result of alleged violations of the Civil Rights Statutes. 8 U.S.C.A. §§ 41, 43, 47(3) and 48. Eighty-four claims are pleaded in two hundred and twenty-six separately numbered paragraphs; the claims relate to the so-called "Peekskill riots" of 1949.

The sixteen defendants may be conveniently divided into two general classes. One group, hereinafter referred to as the "individuals," includes among others the Veterans Joint Council and representatives of certain Westchester County veterans' associations. The other group, hereinafter designated as the "officials," is composed of various county and state officials whose duties, directly and indirectly, touch upon law enforcement in the locality where the rioting allegedly took place.

Among the motions now made are those, joined in by substantially all defendants, testing, essentially, the jurisdiction of the court over the persons and the subject matter of the action, together with the sufficiency of the complaint to state a claim upon which relief may be granted. The latter two defects, if they exist, are never waived, and are properly presented at this time. 2 Moore, Federal Practice, 2233, 2234, (2d ed., 1948).

The complaint is divisible into a number of separate types of claims distinct with respect to the legal principles each invokes. In all but one instance, the same claims are alleged on behalf of more than one plaintiff.

The first such claim is directed against various members of the group heretofore denominated "individuals" and is concerned with a certain concert scheduled for August 27, 1949, in Westchester County, New York. It is averred that the entertainment included fund raising as one of its objectives, but that, in addition, the meeting was "to discuss issues of national importance involving basic questions of constitutional rights." It is further alleged that the named "individuals" conspired to prevent, disrupt and disperse the meeting with intent to deprive the gatherers of rights to free speech and assembly; and that acts of violence pursuant to the conspiracy were committed which prevented the meeting from being held.

Crucial to the matters here at issue is the proper application to the alleged facts of Sections 43 and 47(3) of Title 8 United States Code Annotated, dealing with the protection of civil rights. Section 43 imposes liability, in an action at law, upon every person who, under color of state law, subjects, or causes to be subjected, any person within the jurisdiction of the United States to the deprivation of any rights, privileges or immunities secured by the Constitution and laws.

Section 47(3) authorizes an action for damages where "two or more persons in any State or Territory conspire * * * for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws;" if any such conspirator does, or causes to be done "any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and exercising any right or privilege, of a citizen of the United States * * *." The federal district courts are invested with jurisdiction of actions brought pursuant to the above statutes by Section 1343 of Title 28 of the United States Code Annotated.

■ ■ Plaintiffs, upon these motions, are entitled to the benefit of the most favorable inferences arising out of their complaint. Valle v. Stengel, 3 Cir., 1949, 176 F.2d 697. But a fair reading thereof does not permit the conclusion that the action of the "individuals" named in the first claim was taken "under color of state law." Nor do the averments charge, with regard to the first claim, a conspiracy of the "individuals" with any "officials" who may have been acting "under color of state law." For these reasons, it is evident that Section 43 is totally inapposite to the claim now being considered.

■ ■ Whether or not a claim has been stated under Section 47(3) poses problems substantially more difficult and delicate of solution. Though this statute has been law for nearly ninety years, the only significant precedent for applying it to a factual pattern not involving state action is too youthful to have run the gamut of comment and appeal. Hardyman v. Collins, 9 Cir., 1950, 183 F.2d 308, certiorari granted, 1950, 71 S.Ct. 63.

In general, civil liberties are beyond the constitutional power of Congress to protect from encroachment by individuals unassociated with state action, inasmuch as the prohibitions of the Fourteenth Amendment with regard to due process, and equal protection are directed against the states exclusively. In re Civil Rights Cases, 1883, 109 U.S. 3, 3 S.Ct. 18, 27 L.Ed. 835. Nevertheless, the Hardyman opinion construed Section 47(3) as encompassing the private action of individuals. The court held that the statute could be constitutionally applied to the limited situation where such action deprived a citizen of a privilege and immunity deriving from United States citizenship, and that such part of the statute as did so was "clearly severable" from the remainder.

The facts alleged in the Hardyman complaint differ only in one material particular from those here considered. In that case, the meeting which was alleged to have been disrupted had also been convened to discuss affairs of national interest, but, in addition, it was understood that a resolution was there to be passed to be sent to the

President, the State Department and members of Congress, intended as a petition for redress of grievances. The court held that the right peaceably to assemble and petition for redress of grievances, being an attribute of national citizenship, was within the province of Congress to protect from individual, as well as official encroachment, and that Congress had done so in Section 47(3).

The authorities upon which the majority relied in the Hardyman decision rest their conclusions upon sound principles and state a doctrine which this court will follow. Such cases as have been cited by defendants' counsel as expressing a contrary rule. Love v. Chandler, 8 Cir., 1942, 124 F.2d 785; Viles v. Symes, 10 Cir., 1942, 129 F.2d 828, certiorari denied 1942, 317 U.S. 633, 63 S.Ct. 67, 87 L.Ed. 511; Gregoire v. Biddle, 2 Cir., 1949, 177 F.2d 579, certiorari denied, 1950, 339 U.S. 949, 70 S.Ct. 803, are distinguishable in that none involved a privilege or immunity attributable to United States citizenship. Thus, the statements therein appearing had reference only to other rights protected by the Fourteenth Amendment against state action, and, so understood in no way discord with the doctrine enunciated by the Hardyman decision.

The claim under discussion, however, is premised solely on a deprivation of the right of assembly to discuss national issues, without mention of any interference with a purpose to petition for redress. That the one without the other is a privilege of national citizenship has never been authoritatively determined. Though the matter was discussed in Hague v. C. I. O., 1939, 307 U.S. 496, 59 S.Ct. 954, 83 L.Ed. 1423, the question was left undetermined by a majority of the court, with an affirmative answer from three of the seven justices then sitting.

Certainly the language in United States v. Cruikshank, 1876, 92 U.S. 542, 552, 23 L.Ed. 588, suggests that assembly for purposes other than petitioning for redress may qualify for unlimited federal protection. But see, Presser v. Illinois, 1886, 116 U.S. 252, 267, 6 S.Ct. 580, 29 L.Ed. 615. It was stated in the Cruikshank opinion: "The right of the people peaceably to assemble for the purpose of petitioning Congress for a redress of grievances, *or for any thing else connected with the powers or duties of the national government*, is an attribute of national citizenship, and as such, under the protection of, and guaranteed by, the United States. The very idea of a government, republican in form, implies a right on the part of its citizens to meet peaceably for consultation in respect to public affairs and to petition for a redress of grievances." (Emphasis supplied.)

It is inconceivable that the national government is powerless to protect public discussion of issues relevant to its operations, laws and officials. Such interplay of thought and expression vitalizes a representative government responsible to the people, and, therefore, is essential to the proper functioning of our Constitutional system. See, Powe v. United States, 5 Cir., 1940, 109 F.2d 147, 151, certiorari denied, 1940, 309 U.S. 679, 60 S.Ct. 717, 84 L.Ed. 1023.

This right which accompanies national citizenship implies power in Congress to secure it against invasion from any source. See, In re Quarles and Butler, 1895, 158 U.S. 532, 535, 15 S.Ct. 959, 39 L.Ed. 1080. And, if such power be limited to the circumstance where the purpose to petition federally for redress has already been formulated, then the principle has been emasculated, inasmuch as the desirability or propriety of a petition is best determined subsequent to the digestion of appropriate discussion.

Accordingly, the motions to dismiss the first typical claim as asserted on behalf of those plaintiffs who have alleged that they are citizens of the United States are denied.

The second typical claim seeks to invoke Section 48, Title 8 of the United States Code Annotated. This section imposes liability for damages on "every person who, having knowledge that any of the wrongs conspired to be done, and mentioned in section 47 of this title, are about to be committed, and having power to prevent or aid in preventing the commission of the

same, neglects or refuses so to do," and the wrongful act is committed.

The claim is directed against two of the "officials" said to have jurisdiction over the maintenance of law and order in Westchester County. It is alleged that with knowledge of the conspiracy set out in the first claim, the two "officials" failed to exercise reasonable diligence in providing adequate police protection at the scene of the meeting and rioting; that they had power to take more effective preventative steps against the commission of acts pursuant to the aforesaid conspiracy, but refused or neglected to do so.

We have concluded that the first claim states an actionable "wrong" under Section 47 so that the allegations of the second claim quite clearly recite grounds for relief under Section 48. It has not been contended here that Section 48 is unconstitutional, but it must be observed that the statute is not in terms limited to cases of state action. Nevertheless, Section 48 serves only to further and bolster the protection afforded by Section 47, and to the extent that the latter statute is free of constitutional infirmities, the former to the same extent, and for the same reasons, is likewise valid. Moreover, the statute as here applied, is asserted only against "officials" having, and perhaps exclusively, that "power to prevent or aid in preventing" required by the Act. Thus, with respect to these defendants no problem of private action is involved inasmuch as culpable defection in the performance of official duties may constitute state action. Picking v. Pennsylvania R. Co., 3 Cir., 1945, 151 F.2d 240, certiorari denied, 1947, 332 U.S. 776, 68 S.Ct. 38, 92 L.Ed. 361, Catlette v. United States, 4 Cir., 1943, 132 F.2d 902. Accordingly, the second typical claim, as alleged by the citizen-plaintiffs withstands the motions addressed to it.

■ Each of the two claims hereinbefore discussed is re-stated on behalf of the Civil Rights Congress, an unincorporated association of New York, allegedly devoted to the cause of civil liberties. The gravamen of the first claim, as it must be to sustain the action, is the deprivation of a privilege and immunity of a citizen of the United States. There is ample authority to the effect that such an association is not a "citizen", and, furthermore, that vindication of the right belongs to natural persons only. Hague v. C. I. O., supra; Joint Anti-Fascist Refugee Committee v. Clark, 1949, 85 U.S.App.D.C. 255, 177 F.2d 79, certiorari granted, 1950, Joint Anti-Fascist Refugee Committee v. McGrath, 339 U.S. 910, 70 S.Ct. 573; Blass v. Weigel, D.C. D.N.J.1949, 85 F.Supp. 775. The claim, therefore, will be dismissed as to the Civil Rights Congress.

■ It may be that such an association is entitled to equal protection of the law, International Longshoremen's & Warehousemen's Union v. Ackerman, D.C.D. Hawaii 1949, 82 F.Supp. 65; Llano Del Rio Co. v. Anderson-Post Hardwood Lumber Co., D.C.W.D.La.1948, 79 F.Supp. 382, and that the alleged conspiracy was aimed at depriving it of this right, with a consequent injury to property in loss of revenue from the scheduled concert. But, Section 47(3) could not be applied constitutionally where the above transgressions are the product of action by private individuals. For Section 48 to be invoked, a "wrong" must have been committed under Section 47. It follows, therefrom, that the Civil Rights congress could not assert the second claim under Section 48, unless "wrong" be construed as any injury within the broad terms of Section 47(3) even though such injury may not be actionable thereunder because of constitutional limitations. Such an interpretation would not be without constitutional sanction were Section 48 construed to apply only to "officials", in which case there would be state action transforming into a federal offense that which would not otherwise be one in the stages where it involved only private individuals. Cf. Shelley v. Kraemer, 1948, 334 U.S. 1, 68 S.Ct. 836, 92 L.Ed. 1161.

Nevertheless, it appears evident that the phrase "wrongs * * * mentioned in section 47," must be limited to those which Section 47 could constitutionally reach regardless of the loose terminology employed. Otherwise, it would have to be said that Congress, if it had knowledge of the constitutional defects of Section 47(3), would

nevertheless have written liabilities therein which it knew to be beyond its constitutional power for purposes of that section. This conclusion makes it unnecessary to decide whether private individuals are theoretically capable of depriving another of the equal protection of the law, see, United States v. Harris, 1883, 106 U.S. 629, 643, 1 S.Ct. 601, 27 L.Ed. 290; Hardyman v. Collins, D.C.S.D.Cal.1948, 80 F.Supp. 501, reversed on other grounds, 9 Cir., 183 F.2d 308, supra, or that those "having power to prevent or aid in preventing" in Section 48 necessarily contemplates only "officials." The second claim, as re-alleged by the Civil Rights Congress, shall be dismissed. Cf., Finnish Workers Federation v. Horrocks, D.C.W.D.Wash.1941, 42 F.Supp. 411.

 A third type of claim is stated only on behalf of Paul Robeson, a Negro, for violation of Section 41, Title 8 of the United States Code Annotated. This statute does not authorize an action for damages, but declares, insofar as is relevant here, that "all persons within the jurisdiction of the United States shall have the same right in every State * * * to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens * * *."

This claim is premised upon the same allegations of fact that support the first two claims, and it joins all the defendants named therein. The only addition is that, as a Negro, Robeson is said to have been denied rights under the aforesaid statute. But, the complaint, as a whole, is devoid of a single suggestion that Negroes had been particularized for purposes of discrimination. Whatever may have occurred, it is nowhere averred that, as a factual matter, the Negro "victims" suffered any greater deprivations than the white ones.

The statute calls for parity of treatment, and where nothing has been done by the state to favor white citizens, the act has not been infringed. This claim shall be dismissed.

The remaining claims involve additional incidents allegedly occurring subsequent to those hereinbefore considered. It is stated that on August 27, 1949, the Civil Rights Congress announced that a second meeting and concert would be held near Cortlandt, Westchester County, New York, on September 4, 1949; that the aim thereof "was to reaffirm the rights of citizens to gather peaceably for the purpose of discussion of national issues and to protest the travesty of the prior week." Knowledge of this proposed meeting is alleged as to those defendants against whom the claims are asserted; and that they all conspired "to cause a mob to be gathered which would assist in the disruption and dispersement" of this second meeting in the same manner and for the same purpose as that of the conspiracy directed at the first concert. Both conspiracies are said to have resulted from a single plan or scheme.

The complaint further details the commission of acts designed to disband this second meeting, but relies principally on alleged attacks made on the gatherers when attempting to leave the concert. Police officers, it is claimed, contributed to and participated in these alleged abuses. It is not averred, however, that the meeting did not, in fact, take place on this occasion.

Plaintiffs claim to have been denied, under these additional circumstances, the same rights as were alleged to have been deprived them in connection with the August gathering. Thus, the fourth typical claim joins "individuals" as defendants and is based on the provisions of Sections 43 and 47(3).

Although Section 47(3) is properly applied to the "individuals" by those plaintiffs who are citizens of the United States, one point does require comment. It is the defendants' contention that, inasmuch as the second scheduled meeting and discussion were actually held, there has not been a deprivation of a civil right cognizable under the federal statutes.

 Protection of the privilege to assemble peaceably to discuss national issues must encompass security against being assaulted for having exercised it. The complaint indicates that the alleged subsequent attacks were as much a protest against the meeting as were the attempts to disrupt it in the first instance. In this connection, it

70

is averred that the gatherers were threatened, "you'll get in, but you'll never get out."

■ An argument, similar to defendants' here, was rejected in Bomar v. Keyes, 2 Cir., 1947, 162 F.2d 136, 139. There, Judge Learned Hand wrote: "* * * it would emasculate the act either to deny protection against reprisal to those whom threats did not deter, or to leave without recourse those who were later made the victims of reprisals of which they had not been warned." Cf., Bridges v. California, 1941, 314 U.S. 252, 62 S.Ct. 190, 86 L.Ed. 192; Pennekamp v. Florida, 1946, 328 U.S. 331, 66 S.Ct. 1029, 90 L.Ed. 1295. Accordingly, the complaint states a good claim under Section 47(3) on behalf of those plaintiffs who have alleged citizenship. The application of Section 43 to this claim will be deferred momentarily to await more detailed consideration of that statute below.

Only "officials" are joined as defendants in the fifth typical claim which is fashioned to the terms of Section 43. It is alleged therein that by "failing to provide * * * safe ingress and egress to and from the meeting of September 4, 1949, the conspiracy and acts under color of law of defendants * * * resulted in a prior and subsequent restraint on constitutionally guaranteed rights of speech and assembly * * *." Paragraph 56 of the complaint links the "officials" with the "individuals" in a single conspiracy to disrupt the second meeting. Dereliction of duty and affirmative misdeeds are charged against the police.

■ Of course, the extent to which the defendant officials were responsible for whatever injuries may have occurred will ultimately be a question of fact. But, it is alleged sufficiently that more was involved than the "officials" acting "in the ambit of their personal pursuits." The accountability of a police officer, even where he disclaims beforehand that he acts in the name of the law, was determined in Catlette v. United States, supra. When an official is confronted by a situation with respect to which the state has invested in him authority to deal, his misfeasance or nonfeasance with regard thereto takes place "under color of law." Wrongful abuse of

power or disregard of duty is nonetheless attributable to the state. Screws v. United States, 1945, 325 U.S. 91, 65. S.Ct. 1031, 89 L.Ed. 1495; United States v. Classic, 1941, 313 U.S. 299, 61 S.Ct. 1031, 85 L.Ed. 1368; Valle v. Stengel, supra; Picking v. Pennsylvania R. Co., supra; United States v. Trierweiler, D.C.E.D.Ill.1943, 52 F.Supp. 4.

■■ Section 43 is not limited to invasions of the privileges of a United States citizen. The statute also protects at least against deprivations of rights guaranteed by the due process clause of the Fourteenth Amendment which occur "under color of state law." Douglas v. City of Jeannette, 1943, 319 U.S. 157, 63 S.Ct. 877, 87 L.Ed. 1324. The alleged conduct of the "officials" would be a deprivation of rights to free speech and assembly regardless of whether the meeting and discussion were actually held. Enough has been averred to state a claim under Section 43 against the "officials."

■ Though the fourth typical claim, previously considered, is directed only against "individuals," it also states a valid claim under Section 43. The "individuals" are said to have conspired with the "officials." When, because of the participation of "officials," action is taken which may be characterized as effecting a deprivation, "under color of state law," of rights secured by the Constitution, the "individuals" also fall within the stricture of Section 43. Valle v. Stengel, supra; Picking v. Pennsylvania R. Co., supra; Watkins v. Oaklawn Jockey Club, D.C.W.D.Ark.1949, 86 F.Supp. 1006, affirmed 8 Cir., 1940, 183 F.2d 440. This section protects all persons within the jurisdiction of the respective states, whether citizens or not, against deprivation of free speech and assembly by state action. Accordingly, it would be improper to dismiss this claim as asserted by those plaintiffs who do not allege citizenship, even though they could not avail themselves of Section 47(3).

■ A sixth typical claim joins the "officials" and relies on Section 48. The scope and application of that statute have already been amply discussed. It suffices to say that, as to plaintiffs alleging citizen-

ship, the complaint recites a claim under Section 48. However, with reference to those plaintiffs who do not allege that they are citizens of the United States, it must be inferred that this is not merely an amendable omission, inasmuch as such allegation has been included in the claims of the other plaintiffs in this case, and the complaint, itself, is a single, interdependent document. As to these "alien-plaintiffs," for reasons that follow, the sixth typical claim must be dismissed.

It has been noted that Section 48 requires that a "wrong" be committed of the kind mentioned in Section 47. Moreover, it is an essential element of recovery that the party seeking damages be injured by such an act as is wrongful under Section 47. But, as to the aliens, the "wrong" hereinbefore discussed as occurring under Section 47, i. e., the deprivation of a privilege of a United States citizen, could not have been committed against them.

Actually, the averment of injury resulting from acts wrongful within the terms of Section 47(3) may be recognized upon a liberal reading of the complaint. Thus, "individuals" together with "officials" allegedly conspired for the purpose of depriving plaintiffs of the equal protection of the law, bent upon a purposeful discrimination against a particular group, Snowden v. Hughes, 1944, 321 U.S. 1, 64 S.Ct. 397, 88 L.Ed. 497; Burt v. City of New York, 2 Cir., 1946, 156 F.2d 791, with consequent personal injury to plaintiffs. But, Hardyman v. Collins, supra, intimates that such part of Section 47(3) which creates liability for the above offense is unconstitutional. The statute's terminology is directed at the actions of private individuals as well as of officials, and its reach extends beyond constitutional limits in such instances where it purports to apply to circumstances not involving the transgression of a privilege possessed by a United States citizen. The broad language of the statute does not warrant judicial pruning to reduce its scope, so that, in the absence of the encroachment upon a privilege of national citizenship, the act be construed as applying only to cases of state action. Those plaintiffs who do not allege citizenship, consequently do not allege injury by an act made wrongful within that portion of Section 47(3) which is constitutional and severable, and do not state a claim under Section 48.

There are a number of additional claims which are meant to assert violations of Section 41. The allegations of these claims fail to state a separate claim within the terms of that act. There is not the slightest suggestion in the complaint that an invidious distinction was made by the defendants, jointly or severally, as between "white citizens" and any other persons be they colored people or aliens. These claims shall be dismissed.

With respect to the claims which have been upheld, the defendants' answers raise material issues of fact which must await resolution at later stages of this proceeding. Depending upon the proof, it is foreseeable that there will arise additional legal questions tending to further define the limits of permissible exercise of civil rights. (See, Note 49, Col.L.Rev. 1118, 1949). It has simply been held that certain valid claims have been stated; no findings, of course, have been made that they have been proved.

The court has endeavored to give the broadest constitutional effect to those statutes that seek to secure the full enjoyment of fundamental freedoms to the American people. It is not improbable that some individuals who may ultimately desire to abuse and subvert such liberties, and who are infused with alien and unfriendly principles, will be afforded protection thereby. But any other course succeeds only in promoting the aims of such individuals, inasmuch as a legal structure would be shaped curtailing the rights of all, and as a consequence of their activities. If civil rights are reduced in reacting to them, there results a failure to preserve that which they would destroy. Resentment or provocation should not induce the unwitting abetment of designs hostile to democratic freedom.

Defendants' motions are granted to the extent herein noted, and in all other respects are denied.

Submit order.