## McKIBBIN *v.* CORPORATION & SECURITIES COMMISSION.

1. Brokers—Licenses—Revocation—Failure to Submit Offers—
   Discriminatory Practices.
   Whether defendant corporation and securities commission, au-
   thorized to issue and revoke licenses of real-estate brokers and
   salesmen, might revoke or suspend a license for failure of the
   licensee, without authority of his customer, to submit to his
   customer all offers received by the licensee, *held,* not involved
   in suit by licensees for declaration of rights under commission-
   promulgated rule that revocation of a license could be made
   on the ground of unfair dealing should the licensee discriminate,
   individually or jointly with others, in any real-estate or
   business-opportunity transaction, against any person because
   of "race, color, religion, national origin or ancestry," as
   such failure was admittedly contrary to the law of agency
   controlling the relationship between the licensee and his cus-
   tomer (CL 1948, § 451.213, as amended by PA 1960, No 112;
   1960 AACS, § R 451.309).

2. Administrative Law—Power to Adopt Rules and Regulations.
   The power of an administrative agency to adopt a rule or regula-
   tion depends upon the scope of its legislatively delegated power.

3. Constitutional Law—Division of Powers of Government.
   Generally, the exercise of powers of government conferred upon
   legislative, executive, and judicial departments is forbidden to
   any person in another department (Const 1908, art 4).

---

References for Points in Headnotes
[1, 4, 5, 13]  8 Am Jur, Brokers §§ 7–13.
  Grounds for revocation or suspension of license of real-estate broker
  or salesman.  56 ALR2d 573.
[2, 8, 9]  1 Am Jur 2d, Administrative Law § 69 *et seq.*
[3]  11 Am Jur, Constitutional Law § 168 *et seq.*
[6]  50 Am Jur, Statutes §§ 223, 224, 380, 381.
[7]  50 Am Jur, Statutes § 225 *et seq.*
[10, 11, 12]  1 Am Jur 2d, Administrative Law § 23 *et seq.*
[15]  10 Am Jur, Civil Rights § 2 *et seq.*
[16]  14 Am Jur, Costs § 106.

4. BROKERS — LICENSES — STATUTES — ADMINISTRATIVE LAW — UN-
   FAIR DEALING.
   The statute empowering the corporation and securities commission
   to revoke licenses of real-estate brokers and salesmen for "un-
   fair dealing" does not empower the commission to promulgate a
   rule as to such licensees whereby the term "unfair dealing" pro-
   hibits the licensee from participation in real-estate and business-
   opportunity transactions wherein there is a refusal to perform
   service by the licensee "because of the race, color, religion,
   national origin or ancestry of any person or persons" (CL
   1948, § 451.213, as amended by PA 1960, No 112; 1960 AACS,
   § R 451.309).

5. SAME—REVOCATION OF LICENSES—UNFAIR DEALING—CONSTRUC-
   TION OF STATUTES.
   The construction of the term *unfair dealing,* as used in statute
   authorizing the corporation and securities commission to revoke
   the license of a real-estate broker or salesman for practice so
   characterized is limited to a construction of such term as an
   economic standard and does not extend to aspects of discrim-
   ination that are other than economic (CL 1948, § 451.213, as
   amended by PA 1960, No 112).

6. STATUTES—CONSTRUCTION.
   The Supreme Court, in construing a statute, has no other duty
   to perform than to construe the legislative will as expressed
   in a statute, without regard to the wisdom or justice of the
   act.

7. SAME—CONSTRUCTION—COMMON USAGE—TECHNICAL TERMS—PE-
   CULIAR MEANINGS.
   All words and phrases in a statute must be construed and
   understood according to the common and approved usage of
   the language; technical words and phrases, and such as may
   have acquired a peculiar and appropriate meaning in the law,
   being construed and understood according to such peculiar
   and appropriate meaning (CL 1948, § 8.3a, as added by PA
   1959, No 189).

8. ADMINISTRATIVE LAW—COMMON LAW—STATUTES.
   Administrative boards, commissions, and officers have no common-
   law powers, their powers being limited by the statutes creating
   them to those conferred expressly or by necessary or fair im-
   plication.

9. SAME—CONSTRUCTION OF STATUTES—IMPLIED POWERS.
   The determination of whether an administrative agency has a
   certain power should be made by a liberal construction of the

authority conferred in the light of the purposes for which the agency was created and that which is incidentally necessary to a full exposition of the legislative intent should be upheld as being germane to the law, and while implication of necessary powers may be especially appropriate in the field of internal administration, powers should not be extended by implication beyond what is necessary for their just and reasonable execution.

10. Same—Police Power—Discretion of Officers.

The police power inherent in a State, although incapable of definition and limitation in the abstract, is capable of definite expression for exercise in any given direction and must, if delegated to an administrative agency, provide for definition of purpose and the means of attainment thereof in language leaving no wide administrative discretion, and no discretion at all of a legislative nature.

11. Same—Police Power—Delegation of Power.

The power to carry out a legislative policy enacted into law under the police power may be delegated to an administrative agency under quite general language, so long as the exact policy is clearly made apparent, and the administrative agency may carry out in its action the policy declared and delegated, but it cannot assume it has been vested with power beyond expressed legislative delegation, and must ever seek its way in the light shed by the legislative mandate.

12. Same—Standards of Guidance.

An administrative agency may be clothed with authority to say when the law shall operate, or as to whom, or upon what occasion, provided that the standards prescribed for guidance are as reasonably precise as the subject matter requires or permits.

13. Brokers—Licenses—Unfair Dealing—Racial and Other Discrimination.

The construction of the term *unfair dealing*, as a basis for revoking of a license by the corporation and securities commission to a real-estate broker or salesman by practice of discrimination as to prospective purchasers in real-estate or business-opportunity transactions on the ground of race, color, religion, national origin, or ancestry, would constitute an unconstitutional delegation of legislative powers, where the statute does not itself set forth such construction (Const 1908, art 4; CL 1948, § 451.213, as amended by PA 1960, No 112; 1960 AACS, § R 451.309).

14. SAME—RACIAL AND OTHER DISCRIMINATION—STATE AS PARTICI-
PANT—EQUAL PROTECTION.

The State does not become a participant in discriminatory prac-
tices of licensed real-estate brokers and salesmen, based on
race, color, religion, national origin, or ancestry, because it
has failed affirmatively to forbid such practices, so that such
practices may be said to violate the equal protection clause,
especially where this State has no present custom or history
of segregation or other form of discrimination affirmatively
sanctioned by the State (US Const, Am 14; CL 1948, § 451.213,
as amended by PA 1960, No 112; 1960 AACS, § R 451.309).

15. CONSTITUTIONAL LAW—CIVIL RIGHTS.

All citizens are equal before the law in respect to civil rights
notwithstanding their real rights and constitutional rights are
not as yet one.

16. COSTS — BROKERS — DISCRIMINATION — STATUTES — ADMINIS-
TRATIVE RULE.

No costs are allowed in suit for declaration of rights and to
enjoin enforcement of administrative rule prohibiting certain
discrimination by real-estate brokers and salesmen promul-
gated pursuant to statute conferring power upon the admin-
istrative agency to revoke licenses of brokers and salesmen
for unfair dealing (CL 1948, § 451.213, as amended by PA
1960, No 112; 1960 AACS, § R 451.309).

Appeal from Ingham; Hughes (Sam Street), J.
Submitted July 17, 1962. (Calendar No. 66, Docket
No. 49,801.) Decided February 6, 1963.

Bill by Clifford W. McKibbin, Phillips Realty Co.,
a Michigan corporation, Russell F. Phillips, The
Walter Neller Co., a Michigan corporation, and
Harold M. Davis, with Victor A. Almas intervening
as party plaintiff, against Michigan Corporation &
Securities Commission for declaration of rights and
injunctive relief seeking to bar enforcement of rule
regulating real-estate brokers and salesmen by de-
claring discriminatory action as unfair dealing of
such nature as would justify revocation or suspen-
sion of license. Decree for plaintiffs. Defendant
appeals. Affirmed.

*Fraser, Trebilcock, Davis & Foster,* for plaintiffs.

*Howard D. House,* for intervening plaintiff.

*Frank J. Kelley,* Attorney General, *Eugene Krasicky,* Solicitor General, *James R. Ramsey, Robert Weinbaum,* and *Donald T. Kane,* Assistant Attorneys General, for defendant.

*Amici Curiae:*

*Martin L. Butzel, Victor W. Klein, Robert Alpern,* and *Lee B. Brody,* for American Jewish Committee.

*Archie Katcher, Sidney J. Karbel,* and *Harold Norris,* for Anti-Defamation League of B'nai B'rith.

*Seymour Berger, Paul Hartman,* and *Theodore Leskes,* of counsel for American Jewish Committee and Anti-Defamation League of B'nai B'rith.

*Erwin B. Ellman,* for Michigan Council, American Jewish Congress, American Civil Liberties Union of Michigan, and Michigan State Conference of Branches, The National Association for the Advancement of Colored People.

Souris, J. By legislative grant, the defendant corporation and securities commission may suspend or revoke the license of a real-estate broker or salesman for certain specified acts of misconduct and for other legislatively unspecified conduct "which constitutes dishonest or unfair dealing." PA 1919, No 306, § 13, as amended (CL 1948, § 451.213, as amended by PA 1960, No 112 [Stat Ann 1961 Cum Supp § 19.803]). Pursuant thereto, the commission in 1960 promulgated its Rule No 9, 1954 Administrative Code, 1960 AACS, § R 451.309, by which it was

declared to be "unfair dealing" for a broker or salesman to discriminate, individually or jointly with others, in any real-estate or business-opportunity transaction, against any person because of "race, color, religion, national origin or ancestry." Prior to the effective date of the rule, plaintiff brokers sought a declaration of rights and injunctive relief against defendant, claiming that Rule No 9 exceeded defendant's rule-making power. A temporary injunction restrained enforcement of the rule *pendente lite* and was made permanent upon the chancellor's decree, entered after hearing, that defendant commission had exceeded its rule-making power.

Not involved in this case is the right of defendant commission to revoke or suspend such licenses for a licensee's failure, without authority of his customer, to submit to his customer all offers received by the licensee. Plaintiffs conceded the commission's right of revocation or suspension of licenses for such conduct apparently on the basis that such conduct would be contrary to the law of agency controlling the relationship between the licensee and his customer. The chancellor's decree was so drawn that the commission is unfettered in its right to revoke or suspend licenses for such conduct whether resulting from a licensee's unilateral assumption of the right "to determine the suitability or eligibility of any offer or prospect," or to "screen" or otherwise. Rule No 9 was construed by the chancellor and the parties to reach racial, color, religious, ethnic, or ancestral discrimination by licensees whether or not directed so to do by their customers, and by broker licensees who as owners of property or otherwise engage in the sale thereof as a principal vocation.

That the commission has the power to adopt rules is not questioned. We so held in *Ranke v. Corporation & Securities Commission,* 317 Mich 304, and in

fact in that case we specifically upheld the commission's right to enumerate by rule what conduct constitutes "dishonest or unfair dealing" as that term is used in the act of 1919, as amended. The first question for decision is whether adoption of Rule No 9 was within the power of the commission to determine what constitutes "unfair dealing" within the meaning of the statutory clause "dishonest or unfair dealing."

Section 13 of the act reads as follows:

"Sec. 13. The commission may upon its own motion, and shall upon the verified complaint in writing of any person, investigate the actions of any real-estate broker or real-estate salesman or any person who shall assume to act in either such capacity within this State and shall have the power to suspend or revoke any license issued under the provisions of this act at any time where the licensee in performing or attempting to perform any of the acts mentioned herein, is deemed to be guilty of:

"(a) Making any substantial misrepresentation.

"(b) Making any false promises of a character likely to influence, persuade or induce.

"(c) Pursuing a continued and flagrant course of misrepresentation or the making of false promises through agents or salesmen or advertising or otherwise.

"(d) Acting for more than 1 party in a transaction without the knowledge of all parties thereto.

"(e) Representing or attempting to represent a real-estate broker other than the employer, without the express knowledge and consent of the employer.

"(f) Failure to account for or to remit for any moneys coming into his possession which belong to others.

"(g) Changing his business location without notification to the commission.

"(h) Failure of a broker to return a salesman's license within 5 days. as provided in section 10.

"(i) Paying a commission or valuable consideration to any person not licensed under the provisions of this act.

"(j) Failing to deposit in a custodial trust or escrow account all moneys belonging to others coming into the hands of the licensee in compliance with the following requirements:

"(1) All deposits or other moneys accepted by every person, copartnership, corporation or association holding a real-estate broker's license under the provisions of this act must be retained by such real-estate broker pending consummation or termination of the transaction involved, and shall be accounted for in the full amount thereof at the time of the consummation or termination.

"(2) Every real-estate salesman promptly on receipt by him of a deposit or other moneys on any transaction in which he is engaged on behalf of his broker-employer shall pay over the deposit or other moneys to the real-estate broker.

"(3) Under no circumstances shall a broker permit any advance payment of funds belonging to others to be deposited in the broker's business or personal account or be commingled with any funds he may have on deposit belonging to him.

"(4) Every real-estate broker shall immediately deposit such moneys, of whatever kind or nature, belonging to others in a separate custodial or trust fund account maintained by the real-estate broker with some bank or recognized depository until the transaction involved is consummated or terminated, at which time the real-estate broker shall account for the full amount received.

"(5) Every real-estate broker shall keep records of all funds deposited therein, which records shall indicate clearly the date and from whom he received money, the dates deposited, the dates of withdrawals, and other pertinent information concerning the transaction, and shall show clearly for whose account the money is deposited and to whom the money belongs. All such records shall be subject to in-

spection by the commissioner or his deputies and by employees of the commission. Such separate custodial or trust fund account shall designate the real-estate broker as trustee, and such account must provide for withdrawal of funds without previous notice.

"(k) Any other conduct whether of the same or a different character than hereinbefore specified, which constitutes dishonest or unfair dealing.

"This act shall not be construed to relieve any person from civil liability or criminal prosecution under the general laws of this State."[1]

The rules adopted by the commission prior to 1960, when it adopted Rule No 9, required prompt delivery of copies of listing agreements, offers to purchase, acceptances, and closing statements to the parties by the broker or salesman; provided that listing agreements and offers to purchase contain specified information; required the broker to recommend to the buyer that an abstract of title or title policy be obtained and a lawyer retained; required brokers in their advertising to disclose their professional capacity; required the deposit of moneys received by brokers belonging to others in separate bank accounts; prohibited brokers from acquiring interests in property listed with them without full disclosure to the owner; and imposed upon brokers, salesmen, and applicants for license other requirements of a similar nature.

Rule No 9, with which we are here concerned, provides as follows:

"Any broker or salesman who fails or neglects to abide by the following rules and regulations adopted

---

[1] Subparagraph (j) was added by PA 1960, No 112, which became effective shortly after promulgation of Rule No 9, although it had been adopted by the legislature prior thereto. Present subparagraph (k), the provision pertinent to our inquiry, had previously been subparagraph (j). The act of 1960 made no other pertinent changes.

by the Michigan corporation and securities commission shall be presumed to be guilty of unfair dealing:
* * *

"9. A broker or salesman, acting individually or jointly with others, shall not refuse to sell or offer for sale, or to buy or offer to buy, or to receive an offer to sell or to buy, or to appraise, or to list, or to negotiate the purchase, sale, exchange or mortgage of real estate, or to negotiate for the construction of buildings thereon, or to lease or offer for lease, or to rent or offer for rent, any real estate or the improvements thereon, or any other service performed as broker or salesman, because of the race, color, religion, national origin or ancestry of any person or persons.

"A broker or salesman, acting individually or jointly with others, shall not refuse to sell or offer to sell, or to buy or offer to buy, or to receive an offer to sell or to buy, or to lease or offer for lease, or to negotiate the purchase, sale or exchange of a business, business opportunity, or the good will of an existing business, or any other service performed as broker or salesman, because of the race, color, religion, national origin or ancestry of any person or persons."

Whether the commission had the power to adopt Rule No 9 depends upon the scope of its legislatively delegated power. The scope of such delegated power, in turn, is limited by article 4, Constitution of 1908, by which the powers of government are divided among the legislative, executive, and judicial departments and the powers of each are generally forbidden to be exercised by any person in another department. It is plaintiffs' claim that the subject matter of Rule No 9 does not fall fairly within the meaning of "unfair dealing," as used by the legislature and that, in any event, the subject matter of the *rule* is peculiarly legislative in nature beyond the constitu-

tional powers of the legislature to delegate and of the commission to exercise.

Defendant argues that at the time the term "unfair dealing" was added to the act, by PA 1921, No 387, and at all times since, the legislature fully intended the term to include discriminatory conduct such as is reached by Rule No 9. It is said that Michigan has had a long history of civil rights legislation, beginning with PA 1885, No 130, as amended, later incorporated in the penal code and strengthened by amendment (CL 1948 and CLS 1956, § 750.146 et seq. [Stat Ann and Stat Ann 1959 Cum Supp § 28.343 et seq.]), barring discrimination in places of public accommodation and amusement and in the selection of juries and followed by many other enactments barring discrimination by life and fire insurance companies, schools, common carriers, public institutions, in the civil service and in private employment. From the fact of such legislation, beginning prior to enactment of the real-estate brokers and salesmen law and extending to a current date, defendant argues that the legislature must have considered such discrimination to be unfair and, therefore, must have intended the words "unfair dealing" to include such discriminatory practices by real-estate licensees.[2] We are compelled to a contrary conclusion. The term "unfair dealing" as used in the real-estate act seems to us to connote a more restrictive meaning than attributed to it by defendant.

There is nothing in the act itself to support the broad construction of the term for which defendant contends. If its meaning is to be discerned from other relevant provisions of the act (see *Wyandotte Savings Bank* v. *State Banking Commission*, 347

[2] The fair employment practices act expressly makes such discrimination in employment "an unfair employment practice." PA 1955, No 251, § 3 (CLS 1956, § 423.303, Stat Ann 1960 Rev § 17.458[3]).

Mich 33, at p 44, citing *United Insurance Co.* v. *Attorney General*, 300 Mich 200, and *Attorney General, ex rel. Zacharias*, v. *Detroit Board of Education*, 154 Mich 584), it would seem that it is no broader in its scope than the "good reputation for honesty and fair dealing" required by section 8 of the act[3] to be certified in behalf of an applicant for license or the proof the commission is authorized by the same section to procure "in reference to the honesty, truthfulness, business experience, competence and reputation of any applicant."

The point is that the term "unfair dealing" is not a technical term. Nothing in the act supports the suggestion that it has a peculiar meaning different in nature from or broader than what is commonly understood in the business community to be a reputation for fair or unfair dealing. Not even the defendant has suggested that such general understanding yet encompasses the conduct sought by Rule No 9 to be prohibited. This is *not* to suggest that such discriminatory practices when engaged in by real-estate brokers and salesmen are not unfair; it suggests only that such practices are not commonly understood to be included in the term "unfair dealing" either by our people generally or by our legislature, regrettable as that circumstance is to some of us.

The fact of the matter is that discriminatory restrictions such as are here involved may well be economically unfair to someone;—to the seller, because his market may be artificially contracted without a corresponding increase in "value" to "qualified" prospects for purchase; to the purchaser barred by such discrimination from a particular market, thereby increasing the price to him for "available" prop-

---

[3] CL 1948, § 451.208, as amended by PA 1960, No 112 (Stat Ann 1961 Cum Supp § 19.798).—Reporter.

erty because of the artificially concentrated demand therefor by others similarly subjected to such discrimination; and to the public generally, which ultimately bears the cost of the consequences of such discrimination,—consequences measured by the inevitably enhanced racial and religious tensions resulting from such manifestly unjust prejudice.

There are, of course, other aspects of such discrimination which properly may be called unfair in ways other than economic. With these we need not pause, for nothing could be clearer from the act and, as well, from the other rules of the commission itself (*Wyandotte Savings Bank* v. *State Banking Commissioner, supra,* p 48) that the legislative use of the term "unfair dealing" has reference to nothing so intangible. The point we make is that, even as we acknowledge the possibility that racial, color, credal, ethnic, or ancestral discrimination in real-estate transactions may be unfair, yet we must concede such unfairness is not encompassed within the legislative use of the term "unfair dealing." We have no other duty to perform than to construe the legislative will as we find it, without regard to our own views as to the wisdom or justice of the act. *Plessy* v. *Ferguson,* 163 US 537, 558 (16 S Ct 1138, 41 L ed 256), dissenting opinion of Mr. Justice Harlan.

As in *Wyandotte Savings Bank* v. *State Banking Commissioner, supra,* at p 40, we employ the rules of statutory construction found in CL 1948, § 8.3a, as added by PA 1959, No 189 (Stat Ann 1961 Rev § 2.212[1]):

"All words and phrases shall be construed and understood according to the common and approved usage of the language; but technical words and phrases, and such as may have acquired a peculiar and appropriate meaning in the law, shall be con-

strued and understood according to such peculiar and appropriate meaning."

42 Am Jur, Public Administrative Law, § 26, p 316 *et seq.*, as quoted in *Coffman* v. *State Board of Examiners in Optometry,* 331 Mich 582, at p 590, states the general rule which guides us as follows:

" 'Administrative boards, commissions, and officers have no common-law powers. Their powers are limited by the statutes creating them to those conferred expressly or by necessary or fair implication. * * * In determining whether a board or commission has a certain power, the authority given should be liberally construed in light of the purposes for which it was created, and that which is incidentally necessary to a full exposition of the legislative intent should be upheld as being germane to the law. * * * Implication of necessary powers may be especially appropriate in the field of internal administration. However, powers should not be extended by implication beyond what may be necessary for their just and reasonable execution.' "

We cannot escape the conclusion that the power delegated to the commission to prescribe rules enumerating conduct constituting unfair dealing is not broad enough to encompass within its reach the subject matter of Rule No 9.

Were we to have concluded otherwise, we would have been hard put to overrule plaintiffs' alternative objection that in that event a power so broad as to permit prohibition of Rule No 9 discrimination by administrative agency rule is legislative in nature and beyond the constitutional powers of the legislature to delegate and of the commission to exercise.

In *G. F. Redmond & Co.* v. *Michigan Securities Commission,* 222 Mich 1, at pp 4, 5, we described the limits upon the legislature and administrative agencies in this way:

"The ambit of the power of the commission is in a field, meted and bound by the express provisions of the law. The law under which the commission acted designates with as much particularity as is consistent with public policy and the rights of all concerned, the power vested in the commission and the reasons for exercising the same. While the police power, inherent in the State, is incapable of being defined and subjected to limitations in the abstract, its exercise in any given direction, such as the regulation of trades, occupations and professions, is capable of definite expression, and must, if delegated to a commission or administrative board, define its purpose and the means of attainment thereof, and do this in language leaving no wide administrative discretion, and no discretion at all of a legislative nature. The power to carry out a legislative policy enacted into law under the police power may be delegated to an administrative board under quite general language, so long as the exact policy is clearly made apparent, and the administrative board may carry out in its action the policy declared and delegated, but it cannot assume it has been vested with power beyond expressed legislative delegation, and must ever seek its way in the light shed by the legislative mandate. This marks the line between arbitrary officiousness and the exercise of delegated power to carry out a designated policy under the police power."

More recently, in *Osius* v. *City of St. Clair Shores,* 344 Mich 693, 698 (58 ALR2d 1079), we said:

"There is no doubt that a legislative body may not delegate to another its lawmaking powers. It must promulgate, not abdicate. This is not to say, however, that a subordinate body or official may not be clothed with the authority to say when the law shall operate, or as to whom, or upon what occasion, provided, however, that the standards prescribed for guidance are as reasonably precise as the subject matter requires or permits."

See, also, *Washtenaw County Road Commissioners v. Public Service Commission,* 349 Mich 663, at p 673. If by "unfair dealing" it was intended to permit promulgation of Rule No 9, we find no legislative standard by which the commission, and we, can measure what was done by what was legislatively intended. The reasonably precise statement of legislative policy necessary to a delegation of such authority is totally lacking. If the language were to be so broadly construed, it would constitute an unconstitutional delegation of legislative powers in violation of article 4, Constitution of 1908.

Our conclusion that Rule No 9 was beyond the power of the defendant commission to adopt does not yet conclude the matter. The American Jewish Congress, the American Civil Liberties Union of Michigan, the National Association for the Advancement of Colored People, the American Jewish Committee and the Anti-Defamation League of B'nai B'rith, as *amici curiae,* joined defendant in urging upon us the validity of the rule. In addition to the contention made by defendant, discussed above, the *amici* argued that real-estate brokers and salesmen licensed under the act of 1919, as amended, perform functions so vitally important to the State that their conduct of business on the basis of racial, color, credal, ethnic, or ancestral discrimination constitutes discrimination by State action forbidden by the Fourteenth Amendment to the Constitution of the United States. They also argued that the State was required by its Fourteenth Amendment obligations affirmatively to stop such discriminatory practices by its real-estate licensees, failure to do which constituted adoption of those discriminatory practices as its own. The issue raised by *amici* is not whether the State constitutionally can bar discriminatory conduct by its real-estate licensees. The issue *amici* raise is, instead, whether such discrimi-

natory practices by real-estate licensees constitute
State action in violation of the Fourteenth Amend-
ment by virtue of the public importance of the func-
tions performed by real-estate brokers and salesmen,
their licensure by the State, and the State's failure
affirmatively to prohibit such discrimination by them.
Plaintiffs responded fully to the arguments made not
only by defendant, but also to those made by the
*amici*.

*Amici* place reliance upon the supreme court's re-
cent decision in *Burton* v. *Wilmington Parking Au-
thority*, 365 US 715 (81 S Ct 856, 6 L ed 2d 45), and
upon Mr. Justice Douglas' concurring opinion in
*Garner* v. *Louisiana*, 368 US 157 (82 S Ct 248, 7
L ed 2d 207), decided last December.   In the *Burton
Case*, the supreme court found the Fourteenth
Amendment violated by racial discrimination by a
restaurant privately operated for private profit and
located in a public authority's off-street automobile
parking building in which the restaurant leased space
and facilities from the public authority.   After care-
fully noting that the parking building was publicly
owned and publicly financed under authority of a
State statute, that the leased premises were planned
for such use as an integral part of the parking facil-
ity, that the availability of public parking enhanced
the business of the restaurant and the restaurant's
customers likewise patronized the public parking
facility, and many other facts similarly peculiar
to the case before it, a majority of the Court con-
cluded that the State had placed itself in such a
(p 725) "position of interdependence" with the pri-
vate restaurant that it became "a joint participant in
the challenged activity, which, on that account, can-
not be considered to have been so 'purely private' as

to fall without the scope of the Fourteenth Amendment."[4]

*Garner* v. *Louisiana, supra,* reviewed the convictions of a group of Negroes for disturbing the peace by participating in peaceful sit-in demonstrations at white lunch counters. The court's majority found the records below totally devoid of evidentiary support for the convictions and reversed them as denials of due process of law under the Fourteenth Amendment. Only Mr. Justice Douglas, in a concurring opinion, reached the issue with which we are concerned. He concurred in reversal, not on the due process ground relied upon by the majority[5] but, rather, on the ground that a State may not enforce its *custom* of segregation (citing the *Civil Rights Cases,* 109 US 3, at p 17 [3 S Ct 18, 27 L ed 835]) in a restaurant licensed by a municipality for public use without violating the Fourteenth Amendment's prohibition against the States' denial of equal protection of the laws.

We have very carefully considered these cases and many others, to some of which our attention was directed by the briefs of the *amici.* We conclude that none will support a finding, such as we are requested to make, that the State becomes a participant in discriminatory practices of licensed real-estate brokers and salesmen because it has failed affirmatively to forbid such practices and that, therefore, such practices violate the equal protection clause of the Fourteenth Amendment.

The majority's opinion in the *Burton Case* carefully restricted the holding to the many facts the

---

[4] See St. Antoine, Color Blindness but Not Myopia: A New Look at State Action, Equal Protection, and "Private" Racial Discrimination, 59 Mich L Rev 993.

[5] Mr. Justice Douglas (p 177) stated his belief to be that in Louisiana, with its history of racial segregation, "the mere presence of a Negro at a white lunch counter might inflame some people as much as fisticuffs would in other places" and that, as a consequence, such presence might constitute disturbance of the peace in Louisiana.

Court relied upon to find State action sufficient to invoke the Fourteenth Amendment's prohibition. The fact that the restaurant there involved operated pursuant to a license from the municipality and presumably was subject to regulation in the interest of public health and safety was not considered sufficient to make its actions the actions of the State for Fourteenth Amendment purposes; nor was the bare fact that it leased space from a public agency in a public building sufficient; neither was it sufficient to invoke the Fourteenth Amendment that Delaware had not by law barred discrimination in restaurants. The supreme court required, and found, many other facts (some of which are summarized above) to support its conclusion, facts which, by their nature, are not to be found in this case. See *Derrington* v. *Plummer* (CCA 5), 240 F2d 922, and *Turner* v. *City of Memphis,* 369 US 350 (82 S Ct 805, 7 L ed 2d 762).

Persuasive as is Mr. Justice Douglas' concurring opinion in *Garner,* we cannot apply its principles here. Crucial to his conclusion was the fact that Louisiana had a *custom* of racial segregation, manifested by many State laws and by the history of the State, which its action in arresting and prosecuting the petitioners was designed to enforce. In Michigan there is no custom or history of segregation or other form of discrimination affirmatively sanctioned by the State since 1870 (see Constitution of 1850, art 7, § 1, prior to its amendment by J R No 42 of 1869 and see, also, *People* v. *Dean,* 14 Mich 406), nor are there now any laws imposing or sanctioning such segregation or discrimination.

There are cases in which the courts have held official inaction equivalent to State action sufficient to invoke the Fourteenth Amendment. But those cases all involve a public official's refusal, or culpable failure, to perform a duty affirmatively imposed upon

him.  See *Callette* v. *United States* (CCA 4), 132 F2d
902; *Picking* v. *Pennsylvania R. Co.* (CCA 3), 151
F2d 240; *Lynch* v. *United States* (CCA 5), 189 F2d
476; and *Robeson* v. *Fanelli* (SD NY), 94 F Supp 62.

Other cases have been cited by *amici* from which
they argue, by analogy, that, absent a State law
forbidding real-estate licensees from discriminatory
practices, precedential authority exists for finding
in this case State action sufficient to invoke the prohi-
bitions of the Fourteenth Amendment against such
conduct.  In each of these cases, and in others not
cited, the Fourteenth Amendment was held to bar
racial discrimination.  However, in each such case
significant circumstances not present here were re-
lied upon by the supreme court in finding the Four-
teenth Amendment applicable.  The public school
segregation cases struck down racial discrimination
practiced by the States themselves.  *Missouri, ex rel.
Gaines,* v. *Canada, Registrar of the University of
Missouri,* 305 US 337 (59 S Ct 232, 83 L ed 208);
*Brown* v. *Board of Education of Topeka,* 347 US
483 (74 S Ct 686, 98 L ed 873, 38 ALR2d 1180); and
*Cooper* v. *Aaron,* 358 US 1 (78 S Ct 1401, 3 L ed
2d 5).  The *Burton Case, supra,* because of the
supreme court's finding of interdependence with the
privately operated restaurant, falls within the class
of cases in which the supreme court has said the
Fourteenth Amendment bars racial discrimination
in places of public accommodation.  *Baltimore* v.
*Dawson,* 350 US 877 (76 S Ct 133, 100 L ed 774);
*Holmes* v. *City of Atlanta,* 350 US 879 (76 S Ct
141, 100 L ed 776); *Gayle* v. *Browder,* 352 US 903
(77 S Ct 145, 1 L ed 2d 114); and *New Orleans City
Park Improvement Association* v. *Detiege,* 358 US
54 (79 S Ct 99, 3 L ed 2d 46).  In the restrictive
covenant cases, *Shelley* v. *Kraemer,* 334 US 1 (68
S Ct 836, 92 L ed 1161, 3 ALR2d 441), and *Barrows* v.
*Jackson,* 346 US 249 (73 S Ct 1031, 97 L ed 1586),

the courts of a State were forbidden to enforce private racially restrictive covenants, because to do so would constitute direct affirmative State action in violation of the Fourteenth Amendment, while at the same time the supreme court carefully excluded private performance of such covenants from the prohibitions of the amendment.

Finally, *amici* refer us to *Burks* v. *Poppy Construction Co.* (1962), 57 Cal 2d 463 (20 Cal Rep 609, 370 P2d 313); *Lee* v. *O'Hara* (1962), 57 Cal 2d 476 (20 Cal Rep 617, 370 P2d 321); and *Massachusetts Commission Against Discrimination* v. *Colangelo* (1962), 344 Mass 387 (182 NE2d 595). In these cases State statutes were construed to forbid racial discrimination in the sale or rental of private residential property by the owner or his real-estate agent. As yet, we have no comparable legislation in the State of Michigan. Significantly, both the California and Massachusetts courts upheld the constitutionality of the statutes involved.

It is quite apparent that the supreme court has been expanding its concept of what constitutes State action, within the prohibitory scope of the Fourteenth Amendment, to include conduct (not prohibited by State law) previously considered strictly private and personal to the participants.[6] However, it has yet to include within that expanding concept discriminatory action by State licensees absent a showing of affirmative State action requiring or permitting such conduct or of a relationship of such interdependence between the State and its licensees

---

[6] See Barnett, What is "State" Action under the Fourteenth, Fifteenth and Nineteenth Amendments of the Constitution?, 24 Ore L Rev 227; Shanks, "State Action" and the Girard Estate Case, 105 U Pa L Rev 213; Horowitz, The Misleading Search for "State Action" Under the Fourteenth Amendment, 30 So Cal L Rev 208; Lewis, The Meaning of State Action, 60 Columbia L Rev 1083; and Henkin, *Shelley* v. *Kraemer*: Notes for a Revised Opinion, 110 U Pa L Rev 473. [*Shelley* v. *Kraemer*, 334 US 1 (68 S Ct 1031, 97 L ed 1586, 3 ALR2d 441).—Reporter.]

that the licensees' conduct can be said to be that of the State. To this date at least, the supreme court has refrained from so holding, or even intimating it properly could do so, notwithstanding the opportunity afforded it to have done or said so in *Burton* v. *Wilmington Parking Authority, supra*. Until the supreme court speaks again, we cannot in judicial propriety step beyond the constitutional limits it has thus far so restrictively drawn.

To summarize: The subject matter of Rule No 9 does not fall fairly within the meaning of "unfair dealing" as we construe that term in PA 1919, No 306, as amended. Furthermore, delegation of such rule-making power to defendant commission, if such were intended by the legislature, in the absence of any legislatively prescribed policy standards for the commission's guidance would constitute delegation of legislative power to an executive agency in violation of article 4 of the Constitution of 1908. Finally, we cannot say failure of the State affirmatively to prohibit by law the discriminatory practices embraced by Rule No 9 constitutes such "State action" within the meaning of the Fourteenth Amendment that the amendment may be invoked to forbid such practices when engaged in by licensed real-estate brokers and salesmen.

Sixty-six years ago the first Mr. Justice Harlan, in his dissenting opinion in *Plessy* v. *Ferguson*, 163 US 537, 559 (16 S Ct 1138, 41 L ed 256), wrote this statement of constitutional faith:

"In view of the Constitution, in the eye of the law, there is in this country no superior, dominant, ruling class of citizens. There is no caste here. Our Constitution is color-blind, and neither knows nor tolerates classes among citizens. In respect of civil rights, all citizens are equal before the law. The humblest is the peer of the most powerful. The law regards man as man, and takes no account of his

surroundings or of his color when his civil rights as guaranteed by the supreme law of the land are involved."

Whatever the immediate or distant future may bring in this virulent conflict over the rights of free men, unfortunately we have not yet reached the time in our legal history when reality and constitutional equality are one.

Affirmed. No costs.

Carr, C. J., and Dethmers, Kelly, and Otis M. Smith, JJ., concurred with Souris, J.

Kavanagh, J. (*concurring*). We concur in the result reached by Justice Souris in the above case for the reason that the empowering statute alone can afford the basis for determining the extent of the delegated powers. See *Ranke* v. *Corporation & Securities Commission,* 317 Mich 304. By promulgating Rule No 9, the commission exceeded its delegated rule-making powers by establishing a public policy not declared expressly or by implication in the empowering statute.

We conclude that Rule No 9 is beyond the scope of the commission's rule-making powers. We, therefore, concur in the affirmance of the lower court decree.

Black, J., concurred with Kavanagh, J.

O'Hara, J., took no part in the decision of this case.